USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1081 UNITED STATES, Appellee, v. GUILLERMO ALEMANY RIVERA, Defendant, Appellant. No. 94-1082 UNITED STATES, Appellee, v. EDGAR M. STELLA PEREZ Defendant, Appellant. ____________________ [Hon. Raymond L. Acosta, U.S. District Judge] ___________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO ____________________ Before Torruella, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Robert H. Kiernan with whom Robert M. Simels, P.C. was on brief _________________ _______________________ for appellant Edgar M. Stella Perez. Pedro J. Varela for appellant Guillermo Alemany Rivera. _______________ Sushma Soni, Attorney, Appellate Staff, Civil Division, _____________ Department of Justice, Frank W. Hunger, Assistant Attorney General, ________________ Guillermo Gil, United States Attorney, and Douglas N. Letter, ______________ ___________________ Attorney, Appellate Staff, Civil Division, Department of Justice, were on brief for appellee. ____________________ June 6, 1995 ____________________ CAMPBELL, Senior Circuit Judge. The United States ____________________ filed this civil action in the district court against defendants Guillermo Alemany Rivera ("Alemany") and Edgar Stella Perez ("Stella"). Seeking damages under the False Claims Act ("FCA"), 31 U.S.C. 3729-3733 (1982), the government alleged that defendants had caused a false claim for mortgage loan insurance benefits to be presented to the Department of Housing and Urban Development ("HUD"). The district court denied defendants' motion to dismiss and granted summary judgment in favor of the government, awarding it $1,966,592. United States v. Stella Perez, 839 F. Supp. ______________ ____________ 92, 97-98 (D. P.R. 1993). We hold that the government filed this suit after the applicable limitations period had expired. We therefore reverse. I. During the 1970s, Alemany and Stella engaged in a scheme to defraud HUD and the Department of Health and Human Services ("HHS") in connection with a federally-insured $12.46 million mortgage loan. At that time, Stella was president, chairman of the board of directors, and medical director of Hospital Nuestra Senora de la Guadalupe, a hospital in Puerto Rico; defendant Alemany was a former comptroller of the hospital. The hospital had obtained the mortgage loan in 1974 from a private lender, Merrill, Lynch, Hubbard, Inc. ("Merrill Lynch"), for the purpose of -3- 3 renovating and expanding its facilities. HUD had agreed to insure the hospital's loan pursuant to the National Housing Act, 12 U.S.C. 1715z-7 (1982). During the course of the renovation project, loan proceeds were periodically disbursed to the hospital according to the following procedure. Stella, as president of the hospital, filled out a portion of a HUD "Form 2403," listing various items of completed construction and attaching corresponding invoices. Stella then forwarded the form to Merrill Lynch, which filled out a portion of the form and forwarded it to HUD. After approving the disbursement, HUD sent a Certificate of Mortgage Insurance to Merrill Lynch. Merrill Lynch then released loan funds to the hospital or directly to the suppliers and contractors. Occasionally, loan funds were also disbursed from a separate equipment escrow account, upon HUD's receipt of a letter from Stella with attached invoices for purchased equipment. Defendants siphoned off a portion of the loan proceeds through their control of a furniture company, Casa Cardona, Inc., and its subsidiary, an equipment company called AAA Hospital Supply, Inc., which they incorporated soon after the hospital secured the loan. Through these two companies, Stella and Alemany sold equipment and furnishings to the hospital at substantially inflated prices and charged the hospital for equipment that the companies never provided. -4- 4 The hospital paid for the equipment with the loan proceeds, which were disbursed to the companies by Merrill Lynch pursuant to the procedure described above. In all, defendants submitted 20 separate fraudulent requests for loan proceeds between 1974 and 1978, as to which HUD, upon paperwork furnished by defendants, issued certificates of insurance. On May 1, 1979, the hospital was unable to make a scheduled payment on the loan. After the 30-day grace period expired, the hospital filed a petition for bankruptcy under chapter 11. Merrill Lynch formally declared the loan to be in default on July 1, 1979. On July 2, 1979, Merrill Lynch filed a "Mortgagee's Application for Insurance Benefits," along with a letter notifying HUD of the default and of its intention to exercise its rights under the insurance contract. The July 2 document contained only very basic information, identifying the project and the lender. Then, on July 17, 1979, Merrill Lynch filed a more detailed "Mortgagee's Application for Partial Settlement," setting forth specific financial information about the defaulted loan, including the amount in default and the unpaid principal balance. On October 25, 1979, Merrill Lynch assigned the mortgage to HUD, as the terms of its insurance contract required. On January 17, 1980, after approving the claim, HUD disbursed to Merrill Lynch approximately $12.1 -5- 5 million, representing the unpaid principal balance on the mortgage, less certain credits.  In July of 1982, defendants were charged under a nine-count criminal indictment based upon the events described above. The indictment alleged that they had conspired to defraud the government and had made false statements in support of fraudulent claims. 18 U.S.C. 2, 152, 371, 1001 (1982). After a 30-day trial, a jury convicted defendants on all nine counts. Stella was sentenced to 20 years in prison and placed on probation for an additional five years on the condition that he pay $686,349 in restitution;1 Alemany was sentenced to 10 years in prison and fined $10,000. This court affirmed both convictions and both sentences. United States v. Alemany _____________ _______ Rivera, 781 F.2d 229, 238 (1st Cir. 1985), cert. denied, 475 ______ ____________ U.S. 1086 (1986). On October 25, 1985, the government brought the instant civil action against defendants, seeking recovery under the FCA. An individual is liable under the FCA if he or she "knowingly presents, or causes to be presented, to an officer or employee of the Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C.  3729(1) (1982). As in the criminal indictment, the government alleged that defendants had conspired to divert  ____________________ 1. The district court later vacated the restitution order. -6- 6 the proceeds of the government-insured mortgage loan through their control of the two supply corporations and through the submission of inflated requests for loan proceeds. In so doing, the government asserted, defendants caused Merrill Lynch to submit an inflated "claim" for payment under the insurance contract after the hospital defaulted on the loan. The government moved for summary judgment. Defendants filed an opposition and moved to dismiss on the ground the action was barred by the statute of limitations. Ruling that the action had been filed within the applicable limitations period, the district court denied defendants' motion. The court thereupon granted summary judgment for the government, holding there were no remaining genuine issues of material fact. The court ruled that the factual allegations in the civil complaint were identical to the allegations in the prior criminal action. Accordingly, the court held that defendants were collaterally estopped from re-litigating any of the factual issues, as these had already been determined at the criminal trial. See Emich Motors Corp. v. General ___ ___________________ _______ Motors Corp., 340 U.S. 558, 568-69 (1951). The court awarded ____________ damages based on "uncontroverted evidence in the record." II. Defendants argue on appeal that the district court erred in ruling that this suit was not barred by the statute -7- 7 of limitations. The FCA's statute of limitations provides that an action "must be brought within 6 years from the date the violation is committed." 31 U.S.C. 3731(b) (1982).2 The elements of a "violation" of the FCA are, as noted above, that an individual "knowingly presents, or causes to be presented, to an officer or employee of the Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. 3729(1) (1982).  The present case is complicated by the fact that Alemany's and Stella's fraud acted, in the first instance, upon a private lender, Merrill Lynch, rather than directly upon the government. This fraud, however, was followed by the hospital's default, resulting in Merrill Lynch's claim to HUD for reimbursement for its loss on the defaulted loan under the federal insurance that defendants had helped procure. Although, from Merrill Lynch's perspective, the claim it presented may not have been "false or fraudulent," that claim was inflated by defendants' earlier fraud; and the case law allows the United States, in such circumstances, to sue defendants under the FCA for having "caused" the filing of a "false" claim against the government.  ____________________ 2. This was the statute as it stood when the events at issue in this case occurred. All parties in this suit appear to agree that this earlier version applies. The current statute, in any event, contains essentially the same language. See 31 U.S.C. 3731(b)(1) (1988). ___ -8- 8 Recognition of a false claim action of this sort followed upon the Supreme Court's decision in United States _____________ v. McNinch, 356 U.S. 595 (1958). In McNinch the Court held _______ _______ that a lending institution's mere application for credit insurance, even if fraudulent, did not amount to a "claim" as that term is used in the FCA. Id. The concept of a claim ___ against the government, the Court said, "normally connotes a demand for money or for some transfer of public property." Id. The Sixth Circuit found such a demand to exist where, as ___ here, after fraud was perpetrated on a lending institution for which the perpetrator of the fraud had secured government insurance, the lender presented its own claim to the government for payment or insurance. United States v. ______________ Ekelman & Assoc., 532 F.2d 545, 552 (6th Cir. 1976). See _________________ ___ also United States v. Veneziale, 268 F.2d 504, 505-06 (3d ____ ______________ _________ Cir. 1959). The lender's claim in effect completes the perpetrator's violation of the FCA, commencing the running of the statute of limitations. The Supreme Court itself has yet to endorse this theory, but all the parties in the present case accept it, as, for present purposes, do we. We accordingly proceed on the theory that the "violation" here was "committed," see 31 U.S.C. 3731(b) ___ (1982), for statute of limitation purposes, whenever Merrill Lynch can properly be said to have presented its insurance claim to the government. See United States v. Bornstein, 423 ___ _____________ _________ -9- 9 U.S. 303, 309 (1976) (false claim may be presented through an innocent third party); United States ex rel. Marcus v. Hess, ____________________________ ____ 317 U.S. 537, 544-45 (1943) (provisions of the FCA "indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government"). The claim was "false or fraudulent" in that the amount claimed was inflated by $686,349, the amount that defendants pocketed as a result of their fraudulent scheme. See Veneziale, 218 F.2d at ___ _________ 506.3 Although the parties all agree that a false or fraudulent "claim" under the FCA was "presented" when the loan holder, Merrill Lynch, made its claim for payment on the insurance contract, they differ as to precisely when  ____________________ 3. In holding that a lender's claim for mortgage insurance benefits is a claim under the FCA, the Third Circuit panel in Veneziale wrote: _________ The claim before us now is certainly "grounded in fraud" in that a fraudulent misrepresentation induced the government to assume the obligation which it has had to perform. We are satisfied that the government, having been compelled to pay an innocent third person as a result of the defendant's fraud in inducing the undertaking, is entitled to assert a claim against the defendant under the False Claims Act. Id. at 506. Similarly, in this case, defendants' fraudulent ___ statements induced the government to assume more insurance obligations than it otherwise would have. -10- 10 presentation of the claim took place. Alemany argues that the claim was presented on June 1, 1979, after the 30-day grace period following the hospital's missed payment had expired. Stella took a similar position when arguing in the district court, but he now argues that the claim was actually presented somewhat later, in July of 1979, when Merrill Lynch filled out, executed and submitted to HUD two applications for reimbursement under its insurance contract. Under both Alemany's and Stella's contentions, the present suit is untimely, having been instituted more than six years later, on October 25, 1985. The district court held, however, and the government contends, that Merrill Lynch's claim was not presented until October 26, 1979, when Merrill Lynch formally assigned its mortgage on the hospital's property to the government, thereby complying with a condition precedent to HUD's obligation to pay Merrill Lynch under the insurance contract. See 24 C.F.R. 207.258, 207.259(a), 242.260 ___ (1981) (detailing the mortgage insurance payment process). We quickly dismiss Alemany's argument that the claim was presented on June 1, 1979, 30 days after the hospital missed a payment on the loan.4 Alemany argues that, 30 days after the missed payment, defendants' grace  ____________________ 4. We review a district court's decisions on motions for dismissal and summary judgment de novo. See Heno v. FDIC., _______ ___ ____ _____ 20 F.3d 1204, 1205 (1st Cir. 1994); Pagano v. Frank, 983 F.2d ______ _____ 343, 347 (1st Cir. 1993). -11- 11 period had expired and Merrill Lynch was entitled to seek reimbursement from the government under the terms of its insurance contract. At this point, however, Merrill Lynch had not yet "presented" a "claim" to the government for payment. Although Merrill Lynch was by then entitled to ________ submit a demand for government funds, there is no evidence that Merrill Lynch had yet done so. Indeed, it was possible, if highly unlikely, for Merrill Lynch to choose not to present a claim to the government at all and to have instead looked to the mortgage for reimbursement. See United States ___ _____________ v. Stillwater Community Bank, 645 F. Supp. 18, 19 (W.D. Okla. _________________________ 1986); but cf. United States v. Goldberg, 256 F. Supp. 540, _______ ______________ ________ 541-42 (D. Mass. 1966). In any event, no claim was yet presented, and no "violation" of the FCA occurred, on or before June 1, 1979. See Stella Perez, 839 F. Supp. at 95. ___ ____________ The district court did not err in denying Alemany's motion to dismiss on this ground.5 The harder question and the place where we part company with the decision below and with the government is whether, as Stella now argues, Merrill Lynch presented a claim to the government in July of 1979, when Merrill Lynch submitted formal documents notifying HUD of the default and  ____________________ 5. Alemany's reference to Jankowitz v. United States, 533 _________ _____________ F.2d 538, 547 (Ct. Cl. 1976) is unavailing, since the court in that case explicitly refused to decide whether the limitations period begins to run at default or upon submission of a claim for mortgage insurance. -12- 12 applying for federal insurance benefits relative to the defaulted mortgage loan. In its opinion the district court nowhere discussed the July filings with HUD as possible "claims" triggering the running of the statute of limitations. This is understandable as neither Stella nor anyone else raised the point below. Both defendants argued to the district court that the claim and violation should be deemed to have occurred on June 1, 1979. Ordinarily, this court will not consider for the first time on appeal arguments not raised below, absent "exceptional circumstances." Desjardins v. Van Buren Community Hosp., 969 __________ _________________________ F.2d 1280, 1282 (1st Cir. 1992); United States v. Krynicki, ______________ ________ 689 F.2d 289, 291 (1st Cir. 1982). But we think that special circumstances warrant our considering the point now. The government has answered Stella's argument on its merits without in any way objecting to, or questioning, Stella's right to raise it for the first time on appeal. We can only assume from the lack of objection that the government does not believe that it is now materially prejudiced by the absence of consideration of the matter below or else perhaps, that the government has some other reason for waiving objection to our consideration of this argument. Whatever the reason, as the government has offered no objection and has responded on the merits, we are disposed to address Stella's argument, especially because it is so -13- 13 germane to the question that was extensively addressed below namely, when the claim was presented and when the statute of limitations commenced to run. The actions taken in July 1979, were, moreover, closely related in character and sequence to the actions in June and October that the district court did consider. See Knight v. United States, 37 F.3d ___ ______ ______________ 769, 772 n.2 (1st Cir. 1994).  We realize that Stella's argument relies on material outside the pleadings, the July forms themselves, which the district court had before it, making it technically a cross-motion for summary judgment, rather than a motion to dismiss. See Fed. R. Civ. P. 12(b); 5A Charles Wright & ___ Arthur Miller, Federal Practice and Procedure 1366 (1990). _______________________________ On appeal, we are not bound by the label that defendants and the district court have attached to the motion. William J. __________ Kelly Co. v. Reconstruction Fin. Corp., 172 F.2d 865, 866 _________ __________________________ (1st Cir. 1949); Wright & Miller, 1366, at 497-98 n.20. The only question is whether the government has received, as it is entitled to under Fed. R. Civ. P. 12(b), a reasonable opportunity to present relevant opposing evidence. While aware that Stella's argument on appeal referred to the July documents, the government has at no time objected to Stella's reference to those documents, nor has it argued that it has been materially prejudiced by the reference. We take this as indicating that the government sees no need for further -14- 14 opportunity to present evidence in response to Stella's argument. See Moody v. Town of Weymouth, 805 F.2d 30, 31-32 ___ _____ ________________ (1st Cir. 1986) (adopting a pragmatic approach to Rule 12(b) conversions and holding harmless the district court's failure to notify a party of such conversion where the party "has received the affidavit and materials, has had an opportunity to respond to them, and has not controverted their accuracy"); see also Whiting v. Maiolini, 921 F.2d 5, 6 (1st ___ ____ _______ ________ Cir. 1990).6 The question is thus whether either party is entitled to judgment as a matter of law. To answer this, we must determine when Merrill Lynch's interest in federal reimbursement became a "claim" for purposes of the FCA recognizing, of course, that the malefactors were the defendants, not Merrill Lynch, the latter being merely a vehicle through which defendants' earlier fraud ripened into a cognizable claim under the FCA. The paradigmatic example of a false claim under the FCA is a false invoice or bill for goods or services. See, ___  ____________________ 6. As we indicate below, the government has not suggested that it would submit any additional evidence supporting its arguments on appeal, if given the opportunity to do so. See ___ Moody, 805 F.2d at 31-32 ("Because plaintiff has not shown _____ that he would have done something different had the district court taken him by the hand and told him defendants' motion had been converted into a motion for summary judgment and that this something would likely have defeated defendants' motions, we conclude plaintiff has not demonstrated prejudice and that therefore there would be no point in remanding."). -15- 15 e.g., Bornstein, 423 U.S. at 309. The term, however, applies ____ _________ more generally to other demands for government funds. See, ___ e.g., United States v. Neifert-White, 390 U.S. 228, 230 ____ ______________ _____________ (1968) (false application for government loan); Sell v. ____ United States, 336 F.2d 467, 474 (10th Cir. 1964) (fraudulent _____________ claim for federal assistance). In McNinch, the Supreme Court _______ indicated that a "claim" under the FCA is a "demand for money" that induces the government to disburse funds or to "otherwise suffer immediate financial detriment." McNinch, _______ 356 U.S. at 599. In Neifert-White, the Court further _____________ elaborated, defining a claim to be "a false statement made with the purpose and effect of inducing the Government immediately to part with money." 390 U.S. at 230. Enacted during the Civil War, the FCA's specific aim was to clamp down on widespread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to the government. See S. Rep. No. 99- ___ 345, 99th Cong., 2d Sess. 8, reprinted in 1986 U.S.C.C.A.N. ____________ 5266, 5273 (briefly summarizing the history of the FCA). In furthering this goal, the statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the "claim for payment." Indeed, a contractor who submits a false claim for payment may still be liable under the FCA for statutory penalties, even if it did not actually induce the government to pay out funds or to -16- 16 suffer any loss. See, e.g., Rex Trailer Co. v. United ___ ____ ________________ ______ States, 350 U.S. 148, 153 & n.5 (1956); United States ex rel. ______ _____________________ Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 ______ ___________________________ (9th Cir. 1991). This focus on the claim for payment appears to reflect a congressional judgment that fraud by government contractors is best prevented by attacking the activity that presents the risk of wrongful payment, and not by waiting until the public fisc is actually damaged. By attaching liability to the claim or demand for payment, the statute encourages contractors to "turn square corners when they deal with the government." Rock Island, Arkansas & Louisiana R.R. ______________________________________ Co. v. United States, 254 U.S. 141, 143 (1920) (Holmes, J.). ___ _____________ Thus, in deciding whether a given false statement is a claim or demand for payment, a court should look to see if, within the payment scheme, the statement has the practical purpose and effect, and poses the attendant risk, of inducing wrongful payment. Applying this understanding of the statute along with the language in McNinch and Neifert-White, we conclude _______ _____________ that the application filed by Merrill Lynch on July 17, constituted a "claim for payment" against the government. An official HUD document titled "Mortgagee's Application for Partial Settlement," the July 17 form required Merrill Lynch to furnish detailed information about the loan, including: the name of the insured project, the project number, the -17- 17 date, the names of the mortgagee and servicer, the amount of payment in default, the date of default, the nature of the default, the aggregate cash escrows on hand, the unpaid principal balance, and the undisbursed mortgage proceeds. The form also set forth, in some detail, the method through which the mortgagee would obtain payment under the terms of the contract once the mortgage was assigned. The form required the mortgagee to send notice of assignment by telegram and specified how payment could be obtained either in cash or through debentures.7 Merrill Lynch completed the form and provided the requested answers. The contents of the July 17 application, therefore, even when viewed in the light most favorable to the government, Rivera v. Murphy, 979 F.2d 259, 261 (1st Cir. ______ ______ 1992), indicate that it was a "demand for money" within the meaning of McNinch. By submitting the application, Merrill _______ Lynch told HUD that it was exercising its rights under the insurance contract. Moreover, in providing detailed financial information about the mortgage, the completed form  ____________________ 7. The form provides: "On the date of the assignment or deed is filed for record, a telegram is to be sent to [this address], advising the date that the assignment or deed was filed for record . . . . If the mortgage has been finally endorsed for insurance, partial settlement of approximately 90% of the unpaid principal balance will be made upon receipt of the telegram above . . . . The final settlement will be made after receipt of the fiscal data and title requirements, which are to be submitted within 45 days after the assignment . . . ." -18- 18 specified the amount Merrill Lynch expected to receive under that contract. In setting forth both the amount and method of payment, the application resembled, in many ways, an invoice, bill, application for loan proceeds, or other demand for money from the government. The completed form can be read as essentially saying to HUD, "We are owed this amount under the terms of our insurance contract." It was quite literally a demand for payment from the government. The very title of the form states that it is an "application" for government funds. Compare Neifert-White, 390 U.S. at 230 _______ _____________ (holding that an application for a government loan was a "claim" under the FCA).  The contents of the form, moreover, had the "purpose and effect" of inducing the government to part with its money. See Neifert-White, 390 U.S. at 232. Inflated ___ _____________ because of defendants' earlier fraudulent conduct, the figures in the form were what the insured said it was owed and should be paid by the government. The application created the risk that the government would, in reliance upon those figures, be induced to pay the "fraudulent" amount. There is no evidence that Merrill Lynch submitted any later forms that could have been used to fix the amount of payment. The government asks us to hold that the mortgage assignment executed by Merrill Lynch in October was the -19- 19 "claim" under the FCA. But the mortgage assignment merely transferred the mortgage to the government, in compliance with a condition to payment which had to be met, as a matter of course, in effectuating the July 17 claim. The assignment of the mortgage contained no figures constituting a payment amount and did not purport to demand money. The July 17 form, per contra, allowed for the possibility that funds __________ might be disbursed, under some circumstances, simply upon HUD's receipt of notice of the assignment, further suggesting that the form was intended to be relied upon in fixing the amount of payment. The government has mentioned no facts contradicting this reading. Once Merrill Lynch submitted the completed form, the government had an actionable claim under the FCA. The government appears to argue that the July 17 form is more accurately characterized, not as a demand for payment, but as merely notice from Merrill Lynch of its intention eventually to file a claim. We take this to be an argument that, as a factual matter, the July 17 form did not have the purpose and effect of inducing payment and accordingly presented no risk of wrongful payment in reliance thereof. If the form could in fact be characterized as merely notice, we would agree with the government that it is not a "claim," as notice ordinarily does not put government -20- 20 funds at risk or attempt, by itself, to induce the disbursement of funds.8  The government has failed, however, to support the above argument. No regulations have been called to our attention suggesting that, within the HUD insurance scheme, the filing of the July 17 form really had no purpose or effect of inducing payment and was instead only a means to notify HUD of its estimated liability. Nor, as noted, has evidence been pointed out that Merrill Lynch made other required filings with more detailed financial information. These, had they occurred, might have suggested that the July 17 form was understood to be merely a preliminary estimate, not to be relied upon in fixing the amount of payment. However, the government has nowhere pointed or alluded to any later papers submitted, or required to be submitted, by Merrill Lynch which could have formed the basis for calculating the amount of payment. The completed July 17 form, on its face, fully supports Stella's contention that it was a demand for payment from the government. The government has pointed to no facts that would contradict this reading of the form and no facts suggesting that the figures on the form posed no risk of wrongful payment, relying instead primarily  ____________________ 8. The earlier document submitted by Merrill Lynch on July 2 was arguably merely notice, as it provides only the most basic information about the mortgage loan. We need not decide the point, as the July 17 application was clearly sufficient to constitute a claim. -21- 21 upon the legal arguments presented below. Accordingly, no genuine issue of material fact remains to preclude summary judgment for defendants on this issue. See Anderson v. ___ ________ Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). ___________________ The government's principal argument is a legal one. It relies on the statement in McNinch that the insufficient _______ claim there (the request for government insurance coverage of a future loan) did not, among its other failings, cause the FHA to "suffer immediate financial detriment." McNinch, 356 _______ U.S. at 599. The government contends that, in determining whether a request for government funds caused an "immediate financial detriment," the key factor is the legal effect of ____________ such a request, as specified under the terms of the contract. The government points to the terms of the insurance contract, under which the government's obligation to pay insurance benefits arises only upon assignment of the mortgage. See 24 ___ C.F.R. 207.259(a), 242.260 (1981). As, under the terms of the insurance contract, submission of the completed July 17 form did not give rise to an instant unconditional obligation to pay, the government contends that the form could not have been a "claim" under the FCA.  We think the government reads too much into McNinch's reference to immediacy. Lack of immediate _______ financial detriment is cited in McNinch as one of several _______ reasons an application for credit insurance falls short of -22- 22 being a claim. In Neifert-White, a later case in which the _____________ question was whether a fraudulent application for a government loan constituted a "claim" under the FCA, the Supreme Court held that the application was a "claim" under the FCA even though it triggered no instant legal obligation to pay out funds.9 "This remedial statute reaches beyond 'claims' which might be legally enforced, to all fraudulent ________________ attempts to cause the Government to pay out sums of money." Neifert-White, 390 U.S. at 233 (emphasis added).10 _____________ Neifert-White makes clear that the FCA reaches not only _____________ claims that trigger the government's legal obligation to pay, but more generally all claims that are "made with the purpose and effect of inducing the Government immediately to part  ____________________ 9. The government makes much of the fact that the assignment of the mortgage conferred on the government "all rights and interest arising under the mortgage and credit instrument so in default, and all claims against the mortgagor, or others, arising out of the mortgage transaction," implying that the government could not have sued (and thus that the statute did not begin to run) until it was assigned the mortgage. This reveals a confusion, however, between a suit against defendants under the terms of the mortgage and a suit under the FCA. The fact that the former could not be instituted by the government until assignment is irrelevant with respect to whether a suit under the FCA could be instituted. 10. Compare the July 17 form to the paradigmatic case under the FCA: an invoice for payment. The FCA attaches liability to an invoice, not because it triggers an obligation to pay (though it may well do so), but because it poses a risk that the government may, in reliance upon the false statements contained in the invoice, wrongly pay out funds. Claims that trigger a legal obligation to pay merely constitute a special subset of claims posing a particularly high risk of mistaken payment.  -23- 23 with its money." Id.11 The key inquiry is thus whether the ___ demand for payment, whether or not it gives rise to an unconditional legal obligation to pay right away, has the practical effect of inducing the government to suffer immediate financial harm.12 We hold that the July 17 form's demand for funds had the practical effect of inducing payment in a sufficiently "immediate" manner to satisfy the requirement in McNinch. While the payment of funds was not literally _______ "immediate," in that nearly six months would elapse between the application and the transfer of the bulk of the funds, this lag is not by itself dispositive. Some similar delay might be expected in the government's payment of an invoice or a loan application, both of which are plainly claims under the FCA. Indeed, most of the funds in this case were not disbursed to Merrill Lynch until nearly three months after the mortgage was assigned. We do not read the immediacy language in McNinch as suggesting that government funds must _______ be unconditionally available on literally the same day as the  ____________________ 11. This reading of the term was reemphasized in the 1986 amendments to the FCA, which defines a "claim" as a "request or demand" for payment. 31 U.S.C. 3729(c) (1988); S. Rep. No. 99-345, 1986 U.S.C.C.A.N. at 5284-85. 12. This is not to rule that the subsequent assignment could never, alone, be sufficient to constitute a "claim" under the FCA. It is just that we need not reach this issue since the "claim for payment" was clearly submitted in this case several months earlier, on July 17, 1979. -24- 24 claim is made. In McNinch, the lack of immediacy was noted _______ in the context of an application for mortgage insurance, the submission of which could occur several years prior to the occurrence of any liquidated claims for the disbursement of government funds, if, indeed, any claim for disbursement ever arose at all. McNinch, therefore, presented the different _______ situation of there being as yet no crystallized claim of any sort. In this case, we hold that Merrill Lynch's filing of a specific claim for government insurance on the government's form on July 17, 1979 was a "claim" within the FCA.  As this action was instituted on October 25, 1985, over six years later, it was barred by the FCA's statute of limitations. We do not reach the other arguments on appeal. Reversed. ________ -25- 25