UNITED STATES of America, ex rel.
Edward L. TOTTEN, Appellant,

v.

BOMBARDIER CORPORATION AND
ENVIROVAC, INC., Appellees.

No. 01-7071.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 4, 2002.

Decided April 16, 2002.

H. Vincent McKnight Jr. argued the cause for appellant. With him on the briefs was Peter J. Vangsnes.

Thomas M. Bondy, Attorney, U.S. Department of Justice, argued the cause as amicus curiae supporting appellant. With him on the brief were Roscoe C. Howard Jr., United States Attorney, Douglas N. Letter, Litigation Counsel, United States Department of Justice, Colin C. Carriere, Counsel to the Inspector General, Office of the Inspector General, National Railroad Passenger Corporation, and D. Hamilton Peterson, Deputy Counsel to the Inspector General.

Mark R. Hellerer argued the cause and filed the brief for appellee Bombardier Corporation. Donald A. Carr entered an appearance.

Paul E. Lehner and Randall L. Mitchell were on the brief for appellee Envirovac, Inc. Barbara Van Gelder and Scott M. McCaleb entered appearances.

Before: EDWARDS and RANDOLPH, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge EDWARDS.

Concurring opinion filed by Circuit Judge RANDOLPH.

EDWARDS, Circuit Judge:

Suspecting that his employer, the National Railroad Passenger Corporation ("Amtrak") was being defrauded by two companies with whom it had contracted to supply new rail cars with improved toilet systems, Edward Totten brought an action against these companies under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733 (1994). The District Court dismissed his suit, holding that, pursuant to a recent amendment to Amtrak's governing statute, the FCA could not be invoked with respect to federal money invested in the railroad. Totten now appeals this decision, and in so doing presents us with an issue of first impression regarding the extent to which doing business with Amtrak immunizes contractors from FCA liability.

■ In 1997, Congress enacted legislation which stated, in part, that Amtrak "shall not be subject to title 31." *See* Amtrak Reform and Accountability Act of 1997, Pub.L. No. 105-134, § 415(d), 111 Stat. 2570 (Dec. 2, 1997) ("the Reform Act"), *codified at* 49 U.S.C.A. § 24301(a)(3) (2001). Because the FCA is included in title 31 of the U.S.Code, the District Court concluded that a suit by Totten against contractors doing business with the railroad would impermissibly make Amtrak "subject to" the FCA. We disagree. Instead, we hold that the Reform Act erects no per se bar preventing individuals from bringing FCA actions against those who make false or fraudulent claims implicating the federal funds invested in Amtrak. Neither the text nor the legislative history of § 24301(a)(3) compels a blanket liability exception for businesses serving Amtrak.

Accordingly, we reverse the judgment of the District Court and remand the case for further proceedings. On remand, Totten may amend his complaint, which presently is inadequate, in order to state a proper claim for relief under the FCA. The District Court indicated that it would have permitted such an amendment had it not interpreted the Reform Act as posing an insurmountable obstacle to Totten's suit. We agree that an opportunity to amend is permissible and appropriate.

In amending his complaint, Totten must state with particularity the circumstances surrounding the defendants' allegedly false claims, as required by Rule 9(b) of the Federal Rules of Civil Procedure. He must also aver that the defendants actually submitted false *demands for payment,* rather than merely non-conforming goods. That said, we express no view on the question left open by this court in *United States ex rel. Yesudian v. Howard University,* 153 F.3d 731, 737-39 (D.C.Cir.1998), concerning the relationship between subsections (a)(1) and (c) of 31 U.S.C. § 3729. Instead, we leave it to the District Court to determine, should the issue arise on remand, whether an FCA plaintiff may prevail against a defendant who submits a false "claim" to Amtrak, as that term is defined in § 3729(c), without evidence that the claim was ever submitted (or resubmitted) to the federal government. We will not venture to offer an answer to this difficult legal question on the record currently before us.

## I. BACKGROUND

■ Congress created Amtrak in 1971 in order to stave off the threatened extinction of passenger rail service in the United States. *See* Rail Passenger Service Act of 1970, Public Law No. 91-518, 84 Stat. 1327 (Oct. 30, 1970); *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 453-55, 105 S.Ct. 1441, 1445-57, 84 L.Ed.2d 432 (1985). Since its inception, the statutes governing Amtrak have indicated that the railroad is to be managed as a for-profit corporation, and not as a "department, agency, or instrumentality" of the federal government. *See*

*generally Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 383-86, 115 S.Ct. 961, 966-68, 130 L.Ed.2d 902 (1994). This status continues to the present day. *See* 49 U.S.C.A. § 24301(a). As such, the railroad is generally exempt from those "statutes that impose obligations or confer powers upon Government entities." *Lebron,* 513 U.S. at 392, 115 S.Ct. at 971 (holding that Amtrak is nevertheless subject to the constraints of the Constitution).

Until 1997, Amtrak was formally classified as a "mixed-ownership Government corporation," 31 U.S.C. § 9101(2)(A) (1983), and was therefore bound by the rules that federal law imposes on such entities. *See* Government Corporation Control Act, 31 U.S.C. §§ 9101-9109 ("GCCA"). That year, concerned that these and other restrictions were jeopardizing Amtrak's financial viability, Congress enacted the Reform Act in order to increase the railroad's managerial flexibility and improve its economic prospects. *See* S.Rep. No. 105-85, at 1 (1997), U.S.Code Cong. & Admin.News 1997, 3055 ("In order to achieve operating self-sufficiency, the bill is designed to enable Amtrak to increase efficiencies, reduce costs, and operate as much like a private business as possible."). To these ends, while Amtrak was provided with an influx of federal dollars — appropriations totaling $5.2 billion over the 1998-2002 period — Congress simultaneously sought to alter the railroad's legal status as a recipient of that money.

It did so in two ways that are significant for the present appeal. First, the Reform Act amended the GCCA to remove Amtrak from the list of mixed-ownership corporations. *See* Pub.L. No. 105-134, § 415(d)(2). This change freed the railroad from the requirements that bind companies so designated, such as the submission of budget reports to Congress, 31 U.S.C. § 9103, and annual government audits, 31 U.S.C. § 9105. Relatedly, the Act specifically amended 49 U.S.C. § 24301(a)(3) to provide that Amtrak "shall not be subject to title 31." *See* Pub.L. No. 105-134, § 415(d)(1). These amendments do not figure prominently in the legislative history of the Reform Act. Indeed, the only specific reference to this section of the bill notes tersely that it "removes Amtrak from the Government Corporations Act." H.R.Rep. No. 105-251, at 34 (1997).

Certainly, neither the statutory text nor its history makes any mention of the False Claims Act. Yet, along with the rules regarding government corporations, that statute is housed in title 31. And the present case calls upon us to decide the extent to which this provision of the Reform Act narrowed the reach of the FCA as it relates to Amtrak. This is an issue of first impression.

The dispute giving rise to this case began when Amtrak contracted with two private companies, Bombardier Corporation and Envirovac, Inc. ("the Contractors"), to supply rail cars with new toilet systems for its trains. Bombardier makes the cars and Envirovac makes the toilets. Specifications for the toilet systems were incorporated into Amtrak's contracts with the Contractors. On March 16, 1998, Totten, a former Amtrak employee, filed a suit against the Contractors under the FCA, alleging that they had supplied unsuitable parts that did not meet the contractual specifications. Totten's complaint asserted that these noncompliant toilets were so defective that they endangered the health of Amtrak's passengers and employees. Totten further averred that the Contractors knew of these defects, yet delivered the cars anyway in order to obtain payment under their contracts.

In order to advance its purpose of protecting federal funds from fraud, the False Claims Act allows a private individual such as Totten (known as the relator) to bring a

*qui tam* action "in the name of the Government," and by that means to share in the ultimate recovery. *See* 31 U.S.C. § 3730(b); *see generally Vermont Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 768-70, 120 S.Ct. 1858, 1860-61, 146 L.Ed.2d 836 (2000). The statute's *qui tam* provision is a powerful tool that augments the government's limited enforcement resources by creating a strong financial incentive for private citizens to guard against efforts to defraud the public fisc. *See Yesudian,* 153 F.3d at 736. Indeed, an FCA plaintiff can realize a substantial recovery, as the statute imposes both treble damages and a civil penalty of up to $10,000 on any person who, *inter alia,* "knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1).

The language of § 3729(a)(1) suggests that the alleged false claim must have been presented to the federal government itself. Section 3729(c), however, defines "claim" quite broadly to include:

> any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

Neither this court nor the Supreme Court has definitively explicated the complex relationship between the definition clause in § 3729(c) and the presentment clause in § 3729(a)(1). Instead, we have noted, but declined to answer, the question of whether an FCA plaintiff can prevail by proving only that a false claim was submitted to a federal grantee (such as Amtrak), as de-

fined in subsection (c), without further demonstrating that the claim was submitted (or resubmitted) to the federal government, as suggested by the text of (a)(1). *See Yesudian,* 153 F.3d at 737-39.

The District Court did not face this question. Rather, the court relied on different grounds in rejecting Totten's complaint. *See United States ex rel. Totten v. Bombardier Corp.,* 139 F.Supp.2d 50, 52 & n. 1 (D.D.C.2001). First, the District Court held that, regardless of whether § 3729(a)(1) requires a showing that claims were presented to the United States itself, Totten's complaint failed because it did not allege that the Contractors presented "any request or demand ... for money or property" to *Amtrak.* Rather, the complaint merely asserts that defendants delivered goods to the railroad that did not meet the specifications of its contracts. Second, the District Court found that the complaint makes no representations regarding Amtrak's status as a recipient of federal money, either in general or in connection with the specific projects at issue in this case. Therefore, even if the Contractors had actually presented demands for payment to Amtrak, the complaint gives no indication as to how such demands would be "claim[s]" under the terms of subsection (c). Third, the District Court pointed out that Totten's complaint does not state the time, place, and content of defendants' alleged false statements, as required by Rule 9(b). *See* Fed.R.Civ.P. 9(b) ("the circumstances constituting fraud or mistake shall be stated with particularity").

The District Court noted that ordinarily it would have allowed a plaintiff to cure such pleading flaws by amendment, but concluded that such a remedy would have been futile in Totten's case because his suit was doomed as a matter of law. *See Bombardier,* 139 F.Supp.2d at 52 n. 1. Specifically, the court held that Amtrak's special

legal status rendered its contractors totally immune from liability under the FCA, regardless of how the case was pleaded. According to the District Court, the purpose of the Reform Act was to "negate the normal repercussions of government funding" as it related to Amtrak. *Id.* at 54. Among these repercussions is potential FCA liability for those entities receiving, through contracts with Amtrak, a share of the federal money invested in the railroad. The District Court thus held that the phrase "not subject to title 31" in 49 U.S.C.A. § 24301(a)(3) was intended to prevent "Amtrak's receipt of government funds from bringing Amtrak, and its business dealings, within the reach of the False Claims Act." *Id.* at 55.

Totten appeals from this decision. The United States elected not to intervene in this litigation pursuant to 31 U.S.C. § 3730(b)(5). However, the United States has now filed an *amicus curiae* brief on appellant's behalf arguing against the District Court's expansive construction of the Reform Act.

## II. DISCUSSION

The central issue in this appeal is whether the Reform Act, in stating that Amtrak "shall not be subject to title 31," exempts those who contract with Amtrak from liability under the False Claims Act. We believe that it does not. Rejecting the District Court's construction of the Reform Act leads us to the question of whether Totten should be allowed to amend his complaint to correct its various shortcomings. We believe that he should.

### A. *The Meaning of "Subject To" in 49 U.S.C.A. § 24301(a)(3)*

The argument that the Reform Act bars Totten's suit, which the District Court accepted and which the Contractors echo on appeal, runs as follows: The FCA confers benefits and imposes burdens on entities who receive government funding. The statute's stringent penalties deter fraud but they also may make some businesses reluctant to contract for fear of liability. Accordingly, if demands for payment presented to Amtrak can be considered "claims" within the meaning of 31 U.S.C. § 3729(c), the FCA would both protect and (indirectly) constrain Amtrak in its business transactions. And this would leave the railroad "subject to," in the sense of being "affected by," the terms of the statute. Under this scenario, Totten's cause of action is precluded by § 24301(a)(3).

We are not persuaded by this argument. We must begin, of course, with the text of the statute. As the District Court itself recognized, the words "subject to" leave room for interpretation. *See Bombardier,* 139 F.Supp.2d at 53. It is true that in some contexts "subject to" can mean "affected by," for example, "Boats in San Francisco Bay are often *subject to* fierce winds." However, when the phrase is used in situations more analogous to the one here, it is typically given a narrower cast: an entity is "subject to" a particular legal regime when it is regulated by, or made answerable under, that regime. *See* The Random House Thesaurus 696 (giving "bound by" as chief synonym for the phrase in the sentence, "We are subject to the laws of the country"); *see also, e.g., Texaco, Inc. v. Duhé,* 274 F.3d 911, 918-19 (5th Cir.2001) (natural gas became "subject to an existing contract" within the meaning of the Natural Gas Policy Act when it was "governed by" the terms of that contract).

In *National Collegiate Athletic Association v. Smith,* for example, the Supreme Court considered whether "a private organization that does not receive federal financial assistance is *subject to* Title IX because it receives payment from entities that do." 525 U.S. 459, 465, 119 S.Ct. 924, 928, 142 L.Ed.2d 929 (1999) (emphasis add-

ed). In holding that the NCAA was not subject to the statute, the Court did not preclude all applications of Title IX that indirectly *affect* the organization. Rather, the *Smith* decision mandated merely that the NCAA itself could not be sued under Title IX. *See id.* at 470, 119 S.Ct. at 930. The organization, in other words, was not required to conform its own conduct to the demands of the statute. That said, Title IX suits against the colleges or universities that fund the NCAA are plainly permitted after *Smith,* even though the effect of such litigation might be to limit the number of schools willing to field athletic teams and thus to pay the Association's dues. *Cf. Pederson v. Louisiana State Univ.,* 213 F.3d 858 (5th Cir.2000) (holding that LSU was liable under Title IX for not adequately accommodating the school's female athletes). The fact that Title IX continues to have an indirect effect on the NCAA's business does not, in ordinary usage, render that organization "subject to" that statute.

Other examples reinforce this common understanding of the term. Thus, when the Supreme Court noted that a defendant was "subject to Title VII . . . only if, at the time of the alleged retaliation, it met the statutory definition of employer," it clearly meant that the defendant could be *held liable* under Title VII only if that condition was met. *Walters v. Metro. Educ. Enters., Inc.,* 519 U.S. 202, 205, 117 S.Ct. 660, 663, 136 L.Ed.2d 644 (1997); *see also, e.g., Nat'l Cable and Telecomm. Ass'n, Inc. v. Gulf Power Co.,* 534 U.S. 327, 122 S.Ct. 782, 797, 151 L.Ed.2d 794 (2002) ("[T]he Commission has not determined whether Internet access via cable system facilities should be classified as a 'cable service' subject to Title VI of the Act, or as a 'telecommunications' or 'information service' subject to Title II.").

Moreover, this is how the phrase is used in the context of the False Claims Act itself. In its recent *Vermont Agency* decision, the Supreme Court used the phrase "subject to the false claims law" to describe the category of persons who can be sued under the FCA. 529 U.S. at 784 n. 13, 120 S.Ct. at 1869 n. 13; *see also, e.g., United States ex rel. Long v. SCS Bus. & Tech. Instit., Inc.,* 173 F.3d 870, 876 (D.C.Cir.1999) (speaking of "individuals subject to the Act" as those who could be made liable under it); *United States ex rel. Zissler v. Regents of the Univ. of Minnesota,* 154 F.3d 870, 872 (8th Cir.1998) (asking whether States are "subject to the False Claims Act" in the sense of whether they can be held legally accountable for making false claims to the federal government).

Accordingly, where, as here, a plaintiff brings a *qui tam* action against a third party who has allegedly defrauded a federal grantee, common usage would suggest that the third party, and not the grantee, is being made "subject to" the FCA. We think this to be the more intuitive understanding of the Reform Act as well. Construing § 24301(a)(3) in this light would read it as preventing Amtrak from being directly regulated by the various provisions in title 31, for example, by being sued under the False Claims Act. In contrast, as long as Amtrak is not made to conform its actions to the terms imposed by such statutes, the railroad is not made "subject to" those laws. And, if this is the standard, it is clearly not met in the present case.

Here, Totten seeks to use the FCA not to regulate Amtrak, but instead to recover for the purported fraud of contractors hired to serve the railroad. Allowing the United States (or its relator) to obtain damages from those who contract with Amtrak imposes no direct legal obligation on the railroad. Nor does it permit Amtrak's conduct to be measured against the standards set in the statute. Even if simi-

lar suits may have an incidental effect on Amtrak's future business relationships, Totten's litigation will not compel the railroad to take any action in order to satisfy the demands of the FCA. His action therefore does not implicate the Reform Act's "subject to" provision.

At any rate, this result flows from what we believe to be the most natural and ordinary reading of the phrase "subject to." Accordingly, we will accept that conclusion, and allow Totten's suit to go forward, unless we find evidence that Congress had a different meaning in mind when it drafted § 24301(a)(3). *See, e.g., Williams v. Taylor*, 529 U.S. 420, 431, 120 S.Ct. 1479, 1487-88, 146 L.Ed.2d 435 (2000) ("We give the words of a statute their 'ordinary, contemporary, common meaning,' absent an indication Congress intended them to bear some different import.") (quoting *Walters*, 519 U.S. at 207, 117 S.Ct. at 664). The Contractors argue that such evidence is to be found in the legislative history of the Reform Act. Once again, we disagree.

If anything, the only specific reference that Congress made to the "not be subject to title 31" language suggests that this clause was intended to have a rather limited effect. The amendment appeared in Section 501 of the House version of the bill that became the Reform Act. That section, entitled "Financial Powers," was concerned mostly with restructuring Amtrak's stock. Subsection (e) contained both the clause removing Amtrak from the list of mixed-ownership Government corporations in 31 U.S.C. § 9101, and the clause adding the "subject to" language in 49 U.S.C. § 24301(a)(3). In its section-by-section analysis of the bill, the House Committee on Transportation and Infrastructure reported blandly that this subsection "removes Amtrak from the Government Corporations Act." *See* H.R.REP. No. 105-251, at 34.

Insofar as this statement is useful, it clearly does not help the Contractors' cause. It provides no indication that Congress expected or intended that the phrase "subject to" would take on a broader agenda than its ordinary meaning connotes. To be sure, the language of the amended § 24301(a)(3) plainly does more than to remove Amtrak from the obligations of the GCCA, and must be construed accordingly. However, the Committee's narrow understanding of this change certainly reinforces our decision to reject the expansive interpretation adopted by the District Court. If anything, the legislative history's terse analysis indicates that no one in Congress imagined that the Reform Act would result in a repeal of the False Claims Act as it applies to any private company doing business with Amtrak.

Such an outcome would indeed have been striking. To accept it, we would have to believe that just as Congress was committing itself to a significant investment of federal money in Amtrak, it eliminated a weapon for protecting that money against fraud. We would have to believe that Congress placed a significant obstacle in the way of uprooting the unlawful depletion of that portion of the public fisc used to develop and support the nation's passenger rail system – the very system that the legislation in question was aimed at protecting.

As suggested above, the words that Congress wrote do not compel (and in their ordinary usage resist) this conclusion. And the scant extrinsic evidence that exists to cast light on the meaning of these words suggests that such a dramatic result was far from the legislative mind. We think it not unreasonable to suppose that had such a broad rollback of the FCA in fact been the goal of the Reform Act, some indication of that intent would appear in the congressional record. *Cf. Am. Hosp.*

*Ass'n v. NLRB,* 499 U.S. 606, 613-14, 111 S.Ct. 1539, 1543-44, 113 L.Ed.2d 675 (1991). There is none. And, without some affirmative indicator, we are unwilling to place upon the text of that statute an expansive gloss that would generate this surprising result.

Recognizing the weakness of arguments from specific legislative history, the District Court, and now the Contractors, have focused on the broader purposes of the Reform Act as a possible interpretive guide. This effort falls flat as well. As described above, the District Court concluded that the aim of the Reform Act was to "negate the normal repercussions of government funding." *Totten,* 139 F.Supp.2d at 54. That is, while Congress would continue (at least in the short-run) to appropriate significant federal money for Amtrak, its objective was to have the railroad treated *as if* it was receiving no such funding. The statute, in other words, legislated the pretense that Amtrak was self-sufficient. And, as such, FCA liability would be inappropriate, as that statute applies only where federal funds are at stake.

The problem with this view is that there is no actual basis for it in the legislative history. It is true that, in passing the Reform Act, Congress sought to end federal "micromanagement of Amtrak's operations," H.R.Rep. No. 105-251, at 13, in order to allow the railroad to "operate as much like a private business as possible," S.Rep. No. 105-85, at 1, U.S.Code Cong. & Admin.News 1997, at 3055. However, even if we accept these statements as relevant to determining the meaning of "subject to," they do not necessarily support the Contractors' position. In fact, they are entirely consistent with the position taken by Totten and the United States: that both the goal and effect of the Reform Act were to ensure that Amtrak would be treated just like any other *private* compa-

ny that receives federal money. The Act, in other words, sought to ensure that Amtrak would no longer be subject to special restrictions that were not similarly imposed on private-sector transportation firms.

On this view, allowing Amtrak's *contractors* to be sued under the FCA makes perfect sense, as the contractors of any private business would likewise be subject to liability if they submitted false claims in connection with a project to be reimbursed with federal money. *See, e.g., United States v. Lagerbusch,* 361 F.2d 449 (3d Cir.1966); *Murray & Sorenson v. United States,* 207 F.2d 119, 123 (1st Cir.1953) ("The fact that the claims in this case were not presented directly to the government, but were made to it indirectly through the contractors, does not prevent recovery under the False Claims Statute."); *cf. United States v. Bornstein,* 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) (FCA used to sue a subcontractor whose fraud caused a private company that had contracted with the government to submit false invoices to the United States). Thus, contrary to the Contractors' contention, even the general goals expressed by the drafters of the Reform Act appear to support Totten's attempt to bring suit under the FCA.

In sum, the most natural reading of 49 U.S.C.A. § 24301(a)(3) would not withdraw FCA protection against alleged false claims made by third parties on the extensive sums of federal money invested in Amtrak. Neither is this result mandated, or even suggested, by the scant legislative history of that provision, nor by the larger purposes and aims of the Reform Act as a whole. We therefore reverse the District Court's conclusion that § 24301(a)(3) erects a per se barrier preventing Totten from imposing FCA liability on the Contractors.

**B.** *Allowing Totten to Amend his Complaint*

**1. Flaws In Totten's Unamended Complaint**

 This legal conclusion does not, however, mean that Totten's complaint, at least in its current form, actually states a valid claim under the False Claims Act. Indeed, as suggested above, there are several ways in which his present complaint is deficient. First, Totten has alleged merely that the Contractors "knowingly presented or caused to be presented equipment to an officer or employees of the National Railroad Passenger Corporation, that was knowingly substandard or noncompliant with engineering specifications for the Superliner II Contract to obtain payments from the National Railroad Passenger Corporation ..." *Complaint*, at ¶ 22; *see also id.* at ¶¶ 27, 57. However, the bare assertion that defendants delivered goods that did not conform to contractual specifications is not enough to state a violation of the FCA. Instead, in the sections relevant here, the statute proscribes only false "claims" — that is, actual demands for money or property, *see* 31 U.S.C. §§ 3729(a)(1), (a)(3); § 3729(c) — and "false records or statements" used to induce such claims, *see* § 3729(a)(2). The FCA, in other words, "attaches liability, not to underlying fraudulent activity, but to the 'claim for payment.'" *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir.1996) (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir.1995)). And, to date, Totten has simply made no allegation that the Contractors actually made false demands or submitted false records, whether to Amtrak or to anyone else.

 The second problem with the present complaint is that Totten has provided no basis for concluding that, even if the defendants did present claims to Amtrak, those would be "claims" within the meaning of § 3729(c). This provision defines claim to include a request for payment made to:

a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

Thus, in order to satisfy Rule 12(b)(6), Totten would at least have to plead that the federal government provided some portion of the money requested by the Contractors, or that the government reimbursed Amtrak for what it paid out to improve the toilet systems on its trains. Though he has not yet done so, it appears that Totten is aware of this requirement, and that he informed the District Court that he was prepared to amend his complaint to allege that federal money was implicated in the specific projects at issue. *See* Br. for the United States of America as Amicus Curiae Supporting Appellant 14.

 A third difficulty with the complaint as it stands is that it does not appear to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. This rule requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Totten does not argue that his complaint satisfies this standard, but instead that the rule does not apply to him because he has not alleged that defendants made "fraudulent" claims, but merely "false" ones. He suggests that because false claims are actionable under the FCA even without "proof of specific intent to defraud," § 3729(b)(3), there is no "averment of fraud" within the meaning of Rule 9(b). We disagree.

Every circuit to consider the issue has held that, because the False Claims Act is self-evidently an anti-fraud statute, com-

plaints brought under it must comply with Rule 9(b). *See Bly-Magee v. California,* 236 F.3d 1014, 1018 (9th Cir.2001); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir.1997); *Gold v. Morrison-Knudsen Co.,* 68 F.3d 1475, 1476-77 (2d Cir.1995). Totten cites no authority whatsoever for the hairsplitting distinction he seeks to draw between fraudulent and false claims under 9(b). And we can see no reason to recognize such a distinction.

■ The difference between the two categories of claims is simply the degree of scienter involved. *See United States v. TDC Mgmt. Corp.,* 24 F.3d 292, 297 (D.C.Cir.1994) (distinction turns on "whether the defendant acted with an intent to deceive"). But this difference is entirely insignificant in the context of Rule 9(b)'s pleading requirements. Indeed, the rule specifically allows allegations of "intent, knowledge, and other condition of mind" to be averred generally. *See Gold,* 68 F.3d at 1477. In contrast, the "circumstances" that must be pleaded with specificity are matters such as the "time, place, and contents of the *false* representations," such representations being the *element* of fraud about which the rule is chiefly concerned. *See* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1297 (2d ed.1990) (emphasis added). Therefore, in order to satisfy Rule 9(b), Totten must set forth an adequate factual basis for his allegations that the Contractors submitted false claims (or false statements in order to get false claims paid), including a more detailed description of the specific falsehoods that are the basis for his suit. *See Bly-Magee,* 236 F.3d at 1018-19; *Columbia/HCA,* 125 F.3d at 903.

### 2. Waiver of the Right to Amend

■ The Contractors argue that the flaws in the complaint are fatal, because Totten waived his right to amend his complaint by not seeking leave to do so pursuant to Rule 15(a). Instead, they point out, Totten merely indicated in his Opposition to defendants' motion to dismiss that he stood ready to amend his complaint if the District Court identified any pleading deficiencies. As authority for their position, the Contractors cite *Government of Guam v. American President Lines,* 28 F.3d 142, 149-51 (D.C.Cir.1994), in which we held that plaintiffs whose complaint had been dismissed (for lack of subject matter jurisdiction) had waived their right to amend by failing to make a Rule 15(a) motion, either before or after the District Court granted their opponent's dismissal motion.

The present case, however, is quite different. In *President Lines,* we denied plaintiffs an opportunity to amend only after *upholding* the trial court's decision to dismiss the complaint. In other words, that litigation was over unless we allowed the plaintiffs to reopen it, and we found that their interest in doing so did not outweigh the "general rules favoring the finality of judgments and the expeditious resolution of litigation." *Id.* at 151. Totten's situation presents no such countervailing finality concerns, in light of our conclusion that the District Court was wrong to dismiss the complaint on the only ground it actually gave for doing so. The waiver rule relied upon in *President Lines* is therefore not similarly applicable where the court of appeals *reverses* the trial court's dismissal order. *See The Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 23 (1st Cir.1989) (stating the general rule that where "the pleader has stood upon his pleading and appealed from a judgment of dismissal, amendment will not ordinarily be permitted ... *if the order of dismissal is affirmed*") (emphasis added) (quoting *Rivera-Gomez v. de Castro,* 843

F.2d 631, 635-36 (1st Cir.1988) (allowing amendment, even after affirming dismissal, where it is "in the interest of justice")).

As for Totten's failure to seek leave to amend his complaint after the Contractors' Motion to Dismiss was granted, a factor on which *President Lines* relied in finding a waiver, *see* 28 F.3d at 151, the District Court made clear in the present case that such a request would have been futile. *See Bombardier*, 139 F.Supp.2d at 52 n. 1 ("In other circumstances Totten would be permitted an opportunity to amend his complaint, but, as the remainder of this Opinion demonstrates, such an opportunity is not warranted in this case."). Given that the District Court expressly indicated that it would have allowed Totten to amend had it not viewed the Reform Act as posing an insurmountable obstacle to his suit — regardless of how that suit was packaged — we see no reason, having reversed the court's legal mistake, to forbid what would have been permitted in the absence of that error. Therefore, we will remand the case with instructions that Totten be granted leave to amend his complaint.

In so doing, however, we express no opinion on the question left open by this court's decision in *Yesudian*: whether an FCA plaintiff may prevail against a defendant who submits a false "claim" to a federal grantee (such as Amtrak), without presenting evidence that the claim was ever actually submitted to the U.S. government. *See* 153 F.3d at 737-39. Depending on how Totten crafts his amended complaint, this issue of statutory interpretation may be avoided altogether. We therefore leave it for another day.

## III. CONCLUSION

For the reasons given above, the judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

RANDOLPH, Circuit Judge, concurring:

I agree with all the court has written in its thorough opinion, but I believe a bit more is needed to highlight the problem we leave to the district court – namely, "whether [a False Claims Act] plaintiff can prevail by proving only that a false claim was submitted to a federal grantee (such as Amtrak), as defined in [31 U.S.C. § 3729(c) ], without further demonstrating that the claim was submitted (or resubmitted) to the federal government, as suggested by the text of [31 U.S.C. § 3729(a)(1) ]." Maj. op. at 546. Dicta in *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 737-39 (D.C.Cir.1998), intimates that presenting a claim to any federal grantee is the equivalent to presenting a claim to the federal government. If the reasons given in *Yesudian* are all that can be said for this far-reaching conclusion, I would have much difficulty in accepting it.

Those liable under the False Claims Act include any person who "knowingly presents, or causes to be presented" – and here is the key language – "to an officer or employee of the United States government" a false claim. 31 U.S.C. § 3729(a)(1). Without more, this language would not seem to cover instances in which the false claim is presented to a federal grantee, at least in instances when the grantee did not turn over the claim for reimbursement by the federal government. That may describe the alleged situation here, although we cannot be sure until the plaintiff amends his complaint. It is true that § 3729(c) defines "claim" to include claims submitted to federal grantees.*

---

* A "claim" includes any "request or demand ... for money ... made to a contractor, grantee, or other recipient if the United States

But it is equally true that no matter how "claim" is defined, subsection (a)(1) requires the alleged false claimant to present it (or cause it to be presented) to a federal officer or employee.

Two points, neither of which *Yesudian* highlighted, seem to me of critical importance in construing § 3729. The Attorney General is authorized to sue under the statute in the first instance, or to take over suits brought by private parties on behalf of the federal government (*qui tam* actions), or to allow the private party to prosecute the action on its own. *See Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 769, 120 S.Ct. 1858, 1860-61, 146 L.Ed.2d 836 (2000). If a judgment is rendered against the defendant – and this is the first point – the award of damages is paid to the federal treasury (less a percentage if a private party initiated the action). The second point is that the Act authorizes treble damages plus a civil penalty. If the Act allows suits on claims presented to federal grantees but not presented for payment to the federal government, these two features of the Act lead to a glaring incongruity. To illustrate, suppose the plaintiff in this case prevailed. The recovery would go to the plaintiff and the federal government. Amtrak would recover nothing. Yet the theory of plaintiff's case, as far as we can make out at the moment, is that Amtrak suffered the loss. Presumably, Amtrak would therefore be able to sue the defendants on its own and if its suit were as meritorious as the relator's, it too would recover damages. The effect would be a quadruple damage award – Amtrak's recovery plus the treble damages awarded under the False Claims Act.

This is the consequence of the construction suggested in *Yesudian* and, at the moment, it seems to me at odds with the structure of the Act. On the other hand, requiring that the United States have suffered losses by paying false claims presented to it by the federal grantee avoids this interpretative difficulty, remains faithful to the language of § 3729(a)(1) & (c) and is entirely consistent with the provision in the Act measuring damages not in terms of a grantee's losses, but by "the amount of damages which the Government sustains...." 31 U.S.C. § 3729(a). I hesitate to reach a firm conclusion, however, because we have not had sufficient briefing and argument on the issue and because it may turn out not to be an issue in the case when it is reformulated in the district court.

---

Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any

portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).