B. Alleging Fraud
Complaints brought under the False Claims Act must comply with the requirements of Federal Rule of Civil Procedure 9(b). United States ex rel. Totten v. Bombardier Corp. , 286 F.3d 542, 551-52 (D.C. Cir. 2002). Rule 9(b) requires that a "party state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). However, " Rule 9(b) is still subject to the general short and plain statement command set out in Rule 8." United States v. Kellogg Brown & Root Servs., Inc. , 800 F.Supp.2d 143, 152 (D.D.C. 2011). Taken together, Rules 8 and 9(b) require that "the pleader state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud" and "identify individuals allegedly involved in the fraud." United States ex rel. Williams v. Martin-Baker Aircraft Co. , 389 F.3d 1251, 1256 (D.C. Cir. 2004). The circumstances must be pled with sufficient particularity that a defendant can "defend against the charge and not just deny that they have done anything wrong," id. at 1259 (quoting United States ex rel. Lee v. SmithKline Beecham, Inc. , 245 F.3d 1048, 1052 (9th Cir. 2001) ), but "[w]hat allegations are needed to invest the complaint with indicia of reliability ... depend on the nature of the fraud alleged." United States ex rel. Heath v. AT & T, Inc. , 791 F.3d 112, 125 (D.C. Cir. 2015).
C. Form of Pleadings
The Federal Rules of Civil Procedure also impose certain requirements on the form of pleadings. Under Rule 10(b): "A party must state its claims ... in numbered paragraphs, each limited as far as practicable to a single set of circumstances.... If doing so would promote clarity, each claim founded on a separate transaction or occurrence ... must be stated in a separate count or defense." Fed. R. Civ. P. 10(b).
III. ANALYSIS
The Amended Complaint, which is lengthy and somewhat torturous, contains only two counts: Count One alleges that DynCorp committed fraud in violation of 31 U.S.C. § 3729(a) and Count Two alleges that DynCorp retaliated against Plaintiffs in violation of § 3730(h). Am. Compl. ¶¶ 288-86, 240a-56a.[9]
A. Alleged False Claims Act Violations
The False Claims Act permits suit by individual persons, called "relators," on behalf of the United States, to collect from those who have allegedly submitted false claims for payment from the United States. Therefore, Plaintiffs will be referred *47 to as Plaintiff-Relators hereafter. The statute gives rise to several distinct theories of liability. A defendant may be liable under the "Presentment Provision" of the False Claims Act if he "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The elements of a presentment claim are: (1) the defendant presented, or caused to be a presented, a claim for payment or approval to the federal government; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false when it was submitted. United States ex rel. Schwedt v. Planning Research Corp. , 59 F.3d 196, 198-99 (D.C. Cir. 1995). "Although the statute does not state that the falsity must have been material, many courts have read into the statute a materiality requirement." United States v. DynCorp Int'l, LLC , 253 F.Supp.3d 89, 98 (D.D.C. 2017) ; see also Universal Health Servs., Inc. v. United States ex rel. Escobar , --- U.S. ----, 136 S.Ct. 1989, 2002, 195 L.Ed.2d 348 (2016) ("[T]he common law could not have conceived of fraud without proof of materiality.").
Alternatively, a defendant may be liable under the "False Statement" Provision of the False Claims Act if it "knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The Supreme Court has instructed that "instead of adopting a circumscribed view of what it means for a claim to be false or fraudulent, concerns about fair notice and open-ended liability can be effectively enforced through strict enforcement of the Act's materiality and scienter requirements." Escobar , 136 S.Ct. at 2002 (internal marks omitted). The elements of a false statement claim are: (1) the defendant made or used a record or statement; (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was material to the false or fraudulent claim. United States ex rel. Tran v. Comp. Scis. Corp. , 53 F.Supp.3d 104, 123 (D.D.C. 2014). Under the False Claims Act, a defendant acts "knowingly" if: (1) it had "actual knowledge of the information"; (2) acted in "deliberate ignorance of the truth or falsity of information"; or (3) acted "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). In this context, a record or statement is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." Id. § 3729(b)(4).
False Claims Act violations may be "direct," that is, "factually false claims," or "indirect," that is, "implied false certifications." A "direct false claim" is one "in which a contractor or other claimant submits information that is untrue on its face." Kellogg Brown & Root , 800 F.Supp.2d at 154. A claim or record may be false because it includes "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." Id. Courts distinguish such "factually false claims" from claims that are "not allowed under the contract" because otherwise "the difference between a breach of contract claim and an FCA claim could evaporate." Id. at 155 ; see also Escobar , 136 S.Ct. at 2003 ("The False Claims Act is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations.") (internal marks and citations omitted). A defendant must have "actually submitted false demands for payment, rather than merely nonconforming goods." Totten , 286 F.3d at 544.
For liability under the False Claims Act to arise under an "implied false certification" theory, a party may allege *48 that a defendant submitted requests for payment that failed to disclose a material violation of a statute, regulation, or contractual requirement. Under this theory of liability, the submission of a demand for payment is an "implied certification of compliance" such that "failure to disclose ... [is] a misrepresentation that renders the claim false or fraudulent." Escobar , 136 S.Ct. at 1993. The claim must not only request payment, but also make "specific representations about the goods or services provided; and ... defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." Id. at 2001.
In order the establish knowledge, the plaintiff must prove "that the defendant knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay." United States v. Sci. Applications Int'l Corp. , 626 F.3d 1257, 1271 (D.C. Cir. 2010). If a complaint does not allege any of the relevant contract provisions that were violated by defendant, a plaintiff-relator may have failed to make a claim of implied false certification. See, e.g., United States, ex rel. Barko v. Halliburton Co. , 241 F.Supp.3d 37, 60-61 (D.D.C. 2017) (denying claim under the False Claims Act because plaintiff did not "identify applicable regulations or contract provisions that [defendant] violated, which it then failed to disclose to the government"); United States v. Toyobo , 811 F.Supp.2d 37, 46 (D.D.C. 2011) (denying claim under the False Claims Act because the government did not allege that "any of the relevant contracts contained express provisions requiring five-year warranties against defects").
Mr. Hutchins and Ms. Subhi allege that DynCorp's failure to provide adequate equipment and services as required by the LOGCAP IV contract constituted violations of the False Claims Act; their theories of liability vary according to the nature of the allegations. In their opposition brief, Plaintiff-Relators argue that "[d]irect false claims" are found at Amended Complaint paragraph 1, subparagraphs a-c, i-l, n, and o[10] and that "[f]alse claims that involve a certification" are found at paragraph 1, subparagraphs d-f, h, and m.[11] Because presentment claims under § 3729(a)(1)(A) and false statement claims under § 3729(a)(1)(B) follow "essentially the same legal analysis," the Court will consider them together. Tran , 53 F.Supp.3d at 123.[12]
1. Counts 1(A) and 1(B): Submission *49 of False Reports and Invoices[13]
Relators allege that DynCorp submitted and received payment for false reports and invoices in violation of the False Claims Act. Specifically, Count 1(A) alleges that DynCorp submitted "false DD Form 250 [sic] for supplies and services to obtain unauthorized payment from the United States." Am. Compl. ¶ 286. Count 1(B) alleges that DynCorp "submit[ed] false and fraudulent invoices to the United States for payment." Id. In their Opposition, Plaintiff-Relators distinguish further among their claims, although the Amended Complaint does not. DynCorp argues that Plaintiff-Relators have failed to make these allegations with sufficient particularity to satisfy Rule 9(b).
A successful claim under the False Claims Act must plead "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b) ; see also Totten , 286 F.3d at 551-52. A plaintiff advancing a False Claims Act allegation "must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." Kowal , 16 F.3d at 1278 ; see also Williams , 389 F.3d at 1256 (noting pleader must state the time, place, and content of false misrepresentations).
The Amended Complaint states that DD Form 250 is a "multipurpose report" used by authorized DynCorp personnel to certify to the Army that "services and goods met the Contract Quality Assurance"; the Amended Complaint alleges that DynCorp statements on these forms violated the False Claims Act. Am. Compl. ¶¶ 37-39. This broad allegation could encompass any submission of a DD Form 250 during the course of the LOGCAP IV contract because the Amended Complaint does not allege what reports were falsified, what unauthorized payments were made, or other necessary circumstances. To the extent that these allegations pertain to specific reports or statements, they are described in more detail in other allegations related to specific orders, charges, and payments for goods and services described elsewhere in the Amended Complaint and addressed in the Court's discussion below. Similarly vague are the allegations in Count 1(B) that DynCorp submitted fraudulent invoices. Here too, the Amended Complaint fails to allege a fact-specific cause of action for false and fraudulent invoices, and is, at best, duplicative of other allegations in Counts 1(C)-(P). Counts 1(A) and 1(B) will be dismissed as lacking sufficient particularity.
2. Count 1(C): Duplicative Billing for Vehicles, Equipment, and Services
Plaintiff-Relators allege that DynCorp submitted direct false claims by "ordering, paying for and billing to the United States for vehicles, equipment and services they knew to be duplicative, because each vehicle's stated purpose was already fulfilled by existing subcontracts." Id. ¶ 286. Specifically, the Amended Complaint alleges that DynCorp began subcontracting with third parties for waste management services in the summer of 2009. Id. ¶ 53. These subcontracts "included the provision of services utilizing waste management vehicles, water delivery vehicles and wastewater removal vehicles." Id. ¶ 58. Despite these existing subcontracts, DynCorp allegedly leased vehicles, "ostensibly to make it possible to self-perform this work," beginning *50 in September 2011. Id. ¶¶ 59-60. Plaintiff-Relators contend that doing so constituted a false claim because the lease fees and shipment charges for the DynCorp-leased vehicles were not authorized under DynCorp's LOGCAP IV contract and were duplicative of services for which the Army was already paying; in addition, the vehicles were sometimes driven by unauthorized personnel. Id. ¶¶ 60-62. The vehicle leases also allegedly resulted in a waste of government money because the Army denied DynCorp's request to self-perform the services in question around May 2012, and the leased vehicles, which were duplicative to begin with, had to be shipped out of Afghanistan at Army expense. DynCorp contends that these allegations fail to state a claim because they make "no plausible allegation of scienter" and fail to "satisfy the heightened materiality standard of the FCA."[14] DynCorp Mem. at 28. DynCorp adds that Plaintiff-Relators fail to cite any provision of the LOGCAP IV contract to support their allegation that DynCorp needed authorization before leasing the vehicles. Id. at 28-29.
In assessing allegations of "direct" false claims, courts must distinguish "factually false claims" from claims that are "not allowed under the contract," otherwise "the difference between a breach of contract claim and an FCA claim could evaporate." Kellogg Brown & Root , 800 F.Supp.2d at 155 ; see also Escobar , 136 S.Ct. at 2003. To establish a plausible violation of the False Claims Act, there must be an allegation of an actual demand for money and " 'false records or statements' used to induce such claims." Totten , 286 F.3d at 551.
The Court finds no plausible allegation of falsity related to the initial leasing of the waste management vehicles. Even if DynCorp failed to obtain prior approval for some or all of the leases and related charges,[15] there is no credible allegation that doing so constituted a false claim. DynCorp further notes that Plaintiff-Relators do not allege that the Army was unaware of DynCorp's intention to self-perform the waste and water services or its vehicle and equipment leases to perform, inasmuch as all of it was delivered by military planes.
However, DynCorp's arguments leave unclear what performance the Army was paying for after DynCorp's proposal to self-perform was denied in spring 2012, and cannot be reconciled with Plaintiff-Relators' allegations that DynCorp took steps to conceal the alleged double-billing and the wastefulness of the leases, for example by "directing workers to drive the vehicles around the bases to add miles to the odometers to make it look like the vehicles were being used." Am. Compl. ¶ 94. These efforts to conceal also paint DynCorp's use of generic billing codes in a harsh light. See id. ¶¶ 109-10. Although not strictly disallowed by the LOGCAP IV contract, charging the vehicles to the generic *51 billing code may have allowed DynCorp to avoid explicit revelation of duplicative vehicle leases "worth millions of dollars." Id. ¶ 76; cf. Escobar , 136 S.Ct. at 1994 ( "[C]ertain misrepresentations by omission can give rise to FCA liability"). In the context of a motion to dismiss, a plaintiff is entitled to the reasonable inferences that may arise from the facts it alleges. See Sissel , 760 F.3d at 4. Plaintiff-Relators here are entitled to the reasonable inference from their allegations that DynCorp attempted to conceal from the Administrative Contracting Officer that, even after DynCorp's proposal was denied in spring 2012, the vehicles were still in Afghanistan, still unused, and still being charged to the Army.
Plaintiff-Relators will be permitted to proceed to discovery on Count 1(C).
3. Counts 1(D), 1(E), 1(F), and 1(H): Billing the Army for Inadequate Vehicles
Plaintiff-Relators allege that DynCorp knowingly paid for and billed the Army for vehicles which were "not up to specifications required by the military" (Counts 1(D) and 1(H) ), "not mission capable" (Count 1(E) ), and "older than ordered" (Count 1(F) ). Am. Compl. ¶ 286. Numerous allegations throughout the Amended Complaint relate to the insufficiency of vehicles for which DynCorp allegedly billed the Army. The Court considers each in turn.
First, Plaintiff-Relators allege that DynCorp knowingly billed the Army for seven 50-seat buses, despite the fact that the buses had to be reconfigured to accommodate the size and weight of Army personnel and their gear so that the buses only had 43 seats per bus. The Amended Complaint also alleges that the buses were delivered without required fire extinguishers. DynCorp responds that Plaintiff-Relators' complaint about buses is financially immaterial to its contract with the Army and thus fails to make out a claim. See DynCorp Mem. at 32. While Plaintiff-Relators provide specificity and knowledge of the buses, the modifications described do not rise to the level of a "material" false claim; it is also implausible that the Army did not know of the buses' reconfigurations, considering that Army soldiers could not, and then could, use them; and there is no allegation that DynCorp attempted to conceal the reconfigurations. To the contrary, Plaintiff-Relators do not deny that 50 soldiers and gear could not fit into a normal 50-person bus or that adjustments were not necessary to permit the use of the buses as intended.
Plaintiff-Relators further allege that DynCorp "repeatedly billed the United States for material handling equipment, construction equipment, SUVs, pick-up trucks, buses and other equipment and vehicles that was [sic] not mission capable for a portion of or for the entire preceding month" beginning in 2011[16] at more than 20 camps and forward operating bases throughout the south and southwestern portions of Afghanistan. Am. Compl. ¶ 125. DynCorp counters that these allegations are insufficiently particular to satisfy Rule 9(b) or to advise DynCorp of the alleged errors in billing. Plaintiff-Relators broadly allege:
[t]he Administrative Contracting Officer had to rely on the DynCorp International records in making an approval determination as no other record was submitted.... Such statements [in DynCorp orders and other documents] were false and were relied upon [by] the United States in the Administrative Contracting *52 Officer's approval determination and in the United States['] decision to pay invoices from DynCorp International.... Most equipment was Not Mission Capable at least some of the time .
Id. ¶¶ 129-30 (emphasis added). Plaintiff-Relators do not support these broad assertions with corresponding factual specifics, and, remembering that this contract was performed in a war zone, destroy their own allegation by the last highlighted phrase. They also allege that DynCorp failed to abide by an established practice of submitting "Service Received Reports" from subcontractors that would show whether vehicles were mission capable, but Plaintiff-Relators again fail to provide factual details, fail to cite the LOGCAP IV contract to show that such reports were required prior to payment, and fail to allege facts that support the allegation that the failure to submit Service Received Reports constituted a false claim. See id. ¶¶ 134-36. The Amended Complaint describes one "example" of a specific purchase order, but it does not connect that sole purchase order to the "not mission capable" allegations. Id. ¶ 139.
Plaintiff-Relators further allege that DynCorp billed the Army for at least 67 vehicles and other pieces of equipment that were older than authorized on their respective purchase orders. Id. ¶¶ 149-50, 152. The allegations do not make clear that DynCorp knew at the time it submitted the purchase orders and billed the Army that the vehicles, provided by subcontractors, would be older than stated. See, e.g., id. ¶ 149 ("Upon inspection, the vehicle was really a 2007 model."). Without ongoing representations from DynCorp that the vehicles were current models when they in fact were not, Plaintiff-Relators cannot allege scienter.
Regardless, even if DynCorp "fail[ed] to disclose" the age of a vehicle so as to "render[ ] the claim false," Plaintiff-Relators fail to connect the vehicles' model years to any performance issues. These allegations might make out a breach of contract claim by the Army (which accepted the older vehicles) but the lack of alleged performance failures renders them non-material for purposes of Plaintiff-Relators' False Claims Act lawsuit. Cf. Escobar , 136 S.Ct. at 1997 (describing a patient's death due to medication prescribed by a "purported" doctor).
None of these allegations is sufficient to establish plausible liability under the False Claims Act. "[T]he bare assertion that defendants delivered goods that did not conform to contractual specifications is not enough to state a violation of the FCA. Instead, ... the statute proscribes only false 'claims'-that is, actual demands for money or property-and 'false records or statements' used to induce such claims." Totten , 286 F.3d at 551 (internal citations omitted). Counts 1(D), 1(E), 1(F), and 1(H) will be dismissed for failure to state a claim and lack of particularity.
4. Count 1(G): Falsifying "Service Received Reports" to Obtain Unauthorized Payment from the Army
Plaintiff-Relators allege that management personnel at Kandahar Air Field in Afghanistan falsely stated on Service Received Reports that "heavy equipment and leased vehicles" were mission capable when they lacked authority to sign such reports and lacked sufficient information to certify the mission capable status of the vehicles or equipment. Am. Compl. ¶¶ 170-71. Plaintiff-Relators specify that falsified Service Received Reports were prepared in connection with the reconfigured buses addressed in Count 1(D), but give no further factual information as to other false reports that might have been *53 submitted to the Army. DynCorp responds that Plaintiff-Relators' allegation regarding a "widespread problem" of falsified reports is insufficiently particular to satisfy the requirements of Rule 9(b). DynCorp Mem. at 32-33.
The claim concerning false Service Received Reports related to the seven buses will be dismissed for the same reason that Count 1(D) was dismissed: based on the allegations in the Amended Complaint, DynCorp did not conceal the reconfiguration and there was no Army protest that the buses could transport 43 soldiers with gear, rather than 50 soldiers without. There is, thus, no evidence of materiality to the contract performance by DynCorp. As to other "heavy equipment and leased vehicles,"[17] Plaintiff-Relators do not identify what vehicles at which camps were not mission capable, much less the condition(s) that made them not mission capable. False Claims Act allegations must be supported by sufficient facts to support the inference that a violation of the law has occurred. Plaintiff-Relators broad claim is insufficient for this purpose. Plaintiff-Relators essentially argue that any submission for payment by DynCorp would have been false, but their allegations present only broad and speculative assertions that unnamed maintenance and service managers did not consult maintenance records and did not submit Service Received Reports for the vehicles. Am. Compl. ¶ 136. It is noteworthy that the Amended Complaint later clarifies that (at least some) Service Received Reports were-in fact-submitted but complains that they were submitted by the wrong people. Id. ¶ 170. Count 1(G) will be dismissed for failure to state a claim.
5. Counts 1(I) and 1(N): Charging for Unapproved Goods and Services and for Approved Goods and Services That Were Never Delivered[18]
Plaintiff-Relators allege that DynCorp requested funds for dental equipment and First-Aid training,[19] which were approved, but then used those funds to pay other outstanding invoices. Id. ¶¶ 208-13, 217-19. Plaintiff-Relators also allege that this was a common practice so that the Administrative Contracting Officer would be unable to track actual expenditures. Id. ¶ 225. DynCorp responds that Plaintiff-Relators' allegations fail to satisfy the particularity requirements of 9(b) or to identify a violation of the LOGCAP IV contract. DynCorp Mem. at 35-36.
*54 The purpose of LOGCAP is to "reduce the contracting activity burden, especially in large scale operations with multiple and often related service requirements," Am. Compl. ¶ 28, and DynCorp was awarded the LOGCAP IV contract because of its "proven large scale" and because it "acts as the single point of accountability for access to subcontractor support at all tiers." Id. ¶ 29. Given this purpose, it is particularly noteworthy that Plaintiff-Relators do not allege violations of the LOGCAP IV contract, that DynCorp lacked the authority to move funds between approved subcontracts,[20] that DynCorp misappropriated the funds at a loss to the Army, or even that DynCorp did not intend to purchase the medical equipment when it first made the requests. That is to say, Plaintiff-Relators have not alleged facts showing that DynCorp had the scienter necessary to defraud the Army.
Further, Plaintiff-Relators cannot satisfy the materiality requirement for these claims. DynCorp argues that "[u]sing funds allocated for one piece of equipment to cover payment for another piece of necessary equipment should not be deemed ... an FCA violation." DynCorp Mem. at 36. In this context, the Court agrees. The Army received necessary services and DynCorp advised the Administrative Contracting Officer both times when it submitted materials requests. See Am. Compl. ¶¶ 208, 216. So advised, the Army approved the second funding request. Id. ¶ 216. Cost overruns, without more, do not amount to fraud. Counts 1(I) and 1(N) will be dismissed for failure to state a claim.
6. Count 1(J): Charging the Army for Unauthorized Services
Plaintiff-Relators complain that DynCorp "charg[ed] the United States for unauthorized services." Id. ¶ 286. The more specific allegations in the Amended Complaint concerning billing for unauthorized services are alleged separately. See, e.g. , Count 1(C) (billing for leased waste management vehicles under generic billing codes); Count 1(N) (billing for unauthorized medical services). Count 1(J) is alleged with insufficient particularity to survive as a separate claim. See, e.g., Anderson v. USAA Cas. Ins. Co. , 221 F.R.D. 250, 253 (D.D.C. 2004) (specifying that a complaint must provide the "who, what, where, when, and how with respect to the circumstances of fraud") (internal marks omitted). Further, merely charging the government for unauthorized services, without falsity, does not constitute a claim under the False Claims Act. See Kellogg Brown & Root , 800 F.Supp.2d at 155 (dismissing the government's theory that "claims are 'false' precisely because they are 'disallowed' by the contract"). Count 1(J) also fails to state a claim and will be dismissed.
7. Count 1(K): Billing as Purchase Order Items to Obtain Higher Commissions Than for Subcontract Services
Plaintiff-Relators allege that in April 2011 DynCorp began submitting invoices as purchase orders, instead of for service subcontracts, in order to receive an extra 1.5% commission on costs. Although they acknowledge that the Administrative Contracting Officer knew of this change, they allege that he was not authorized to change pay rates under the LOGCAP IV contract. Am. Compl. ¶¶ 185, 190-92. DynCorp responds that Plaintiff-Relators fail to identify any provision of the LOGCAP IV contract that would make purchase order claims false and that it is "highly *55 relevant" that the Administrative Contracting Officer knew of the change and did not object. DynCorp Mem. at 33-34.
Plaintiff-Relators allege that Administrative Contracting Officers do not have unilateral authority to amend the LOGCAP IV contract and DynCorp does not disagree. Id. ¶ 188. Plaintiff-Relators further contend that DynCorp "should have gone to the United States Army Sustainment Command" to secure a change in its contract rates. Id. ¶ 187. However, contrary to the implicit allegation in Paragraph 187, the Amended Complaint acknowledges that it was appropriate for DynCorp to "submit the required plan to change acquisitions to purchase order[s] for approval by the Administrative Contracting Officer." Am. Compl. ¶ 186; see also id. ¶ 191 (alleging DynCorp's Vice President for Sourcing "Robinson ... had told the Administrative Contracting Officer" of the changed invoicing practice). Thus, Plaintiff-Relators admit that DynCorp did not violate the LOGCAP IV or the False Claims Act when it informed the Administrative Contracting Officer that it was changing its billing practices , but not the contract rates or any language in the contract. Plaintiff-Relators conflate changing billing practices with changing the actual contract rates.
Further, Plaintiff-Relators do not allege that this change in billing caused DynCorp to charge the Army for goods and services that it did not receive. While it is possible the Army could have paid less, without falsity there is no factual basis to make out a claim under the False Claims Act. To the contrary, Plaintiff-Relators allege conduct that was "not allowed under the contract" and may have constituted a breach of contract, but not a false claim. Cf. Kellogg Brown & Root , 800 F.Supp.2d at 155. While Plaintiff-Relators allege that DynCorp "did not submit or otherwise inform the United States of their plan to engage in this practice," Am. Compl. ¶ 188, they later allege that DynCorp had informed the Administrative Contracting Officer.[22] See Id. ¶ 191. Count 1(K) fails to state a claim and will be dismissed.
8. Count 1(L): Charging for Duplicative or Unneeded Medical Procedures, Drugs, and Materials
Plaintiff-Relators allege that DynCorp violated the contractual requirements of MOD 11 by requiring all employees who traveled through Dubai en route to Afghanistan to have physical examinations if the employee had not been examined in the last nine months, and then billing the Army for the physical exam and the time employees spent in Dubai. Id. ¶¶ 247-50, 255-56. Plaintiff-Relators also allege that DynCorp's employee processing facilities in Dubai and India administered "hundreds of inoculations and vaccines that were expired or were for pediatric doses" in violation of the standards of MOD 11, but DynCorp submitted claims for full reimbursement to the Army. Id. ¶¶ 258-59, 261-63. DynCorp responds that Plaintiff-Relators fail to allege that DynCorp ever *56 misrepresented its practice of conducting physicals after nine months to the Army. See DynCorp Mem. at 37. DynCorp adds that no false claims were submitted regarding vaccinations and that, at most, Plaintiff-Relators allege a breach of contract. See id. at 37-38.
Although perhaps examinations could have been opportunistically performed every 12 months, or more frequently, or less frequently, there is no indication that DynCorp implemented an unreasonable, much less illegal policy. Certainly, the Court does not read MOD 11 to require DynCorp to examine each employee exactly at 15 months. It's possible that another policy would have saved the government money, but Plaintiff-Relators do not allege that the Army was unaware of DynCorp's policy, that DynCorp misrepresented its policy, or that DynCorp submitted any false statements to the government. The Army may yet determine that DynCorp's policy was a breach of contract, but there is no indication of fraud.
Plaintiff-Relators' allegations regarding the immunization program fail for similar reasons. First, Plaintiff-Relators do not allege that DynCorp had prior knowledge of the vaccine quality or intended that its employees receive deficient immunization. To the contrary, the pleadings indicate that the issue was identified only after DynCorp made inquiries of the medical personnel in India and Dubai and examined the medical records. See Am. Compl. ¶¶ 262-65. As such, it cannot be said that DynCorp's knowledge at the time satisfies the scienter requirements of the False Claims Act.[23] Second, there is no allegation that the Army was not informed of the mistake once it was identified. DynCorp may have still charged the Army for the ineffective vaccines and the Army may have incurred additional costs for medical issues arising from this mistake, but, as with the claim above, whether the Army should be reimbursed is a question of breach of contract, not fraud. Count 1(L) will be dismissed for failure to state a claim.
9. Count 1(M): Charging the Army for Personnel Who Were Not Qualified for the Positions Hired
Plaintiff-Relators allege that at least 80% of the Subcontracts Department personnel were unqualified in violation of the LOGCAP IV Contract and that this problem "was repeated in each DynCorp International department in Afghanistan." Id. ¶¶ 196-205. Plaintiff-Relators also allege that "hundreds of workers from the Philippines, India, Bosnia, Nepal, [and] Kenya ... did not meet the hiring criteria," "did not have the ability to speak English," and "were also working outside their job description." Id. ¶¶ 206-07. DynCorp responds that these "sweeping allegations" do not meet Rule 9(b)'s particularity requirement and have misunderstood the conditions of the LOGCAP IV contract regarding employee qualifications. Mem. at 34-35.
Together with alleged statements by Ms. Wrubbel, Regional Human Resources Manager in Afghanistan, Plaintiff-Relators plead their claim regarding the Subcontracts Department with sufficient particularity. Who: 80-90% of the Subcontracts Department. Am. Compl. ¶¶ 197, 202. What: That the only requirements for employment were that "the person have a pulse, be able to string together a sentence in English and be enthusiastic." Id. ¶ 199.
*57 Where: The Subcontracts Department in Afghanistan. When: The period of Mr. Scott's tenure as head of the Subcontracts Department, "about eight months from late June 2011 to February 2012." Id. ¶¶ 200, 203. Plaintiff-Relators do not identify the unqualified employees in the Subcontracts Department. However, given that such a large percentage of workers in a relatively small department are alleged to have been unqualified, and given that Ms. Wrubbel's report is in DynCorp's possession, the Court is satisfied that this portion of the complaint has not been filed as "a pretext for the discovery of unknown wrongs."[24] See Kowal , 16 F.3d at 1279 n.3.
That said, "[t]he FCA's materiality requirement is demanding." Escobar , 136 S.Ct. at 1994. Materiality "cannot be found where noncompliance is minor or insubstantial." Id. at 2003. Further, the government's decision "to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." Id. ; see also id. at 2001 (noting that "statutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment"). Here, Plaintiff-Relators allude generally to education and experience requirements for Subcontracts Department employees but do not explain how DynCorp's internal hiring decisions were material to the decisions of the Army.[25] Plaintiff-Relators content themselves merely to state that the Army payed "for employees who did not meet the ... qualifications ... for the jobs for which they were hired to perform." Am. Compl. ¶ 195. But the crux of the Army's decision to award the LOGCAP IV contract to DynCorp was DynCorp's "proven, large scale, global reach logistic service sector capabilities," id. ¶ 29, not the qualifications of its 20-person Subcontracts Department staff. In Escobar, the defendant "misrepresented its compliance with mental health facility requirements that are so central to the provision of mental health counseling that the Medicare program would not have paid these claims had it known of these violations." Escobar , 136 S.Ct. at 2004. The importance of complying with the qualification requirements for the Subcontracts Department is not so apparent. Indeed, notwithstanding whatever performance issues may have arisen (none are alleged), the Army was satisfied enough with DynCorp's performance that it renewed the contract each year from 2010 through at least 2016. See Am. Compl. ¶ 46.
Regarding workers from the Philippines, India, and other countries, Plaintiff-Relators misstate the language requirements. Although Plaintiff-Relators allege that many of the workers "did not have the ability to speak English," the LOGCAP IV contract requires only that "all Contractor employees shall either be literate in English or there shall be a translator available ." LOGCAP IV Contract at 17 (emphasis added). Plaintiff-Relators further allege that these workers were not always working within their job descriptions, but Plaintiff-Relators do not allege that the contract does not allow the flexibility to have, at least on some occasions, *58 "a crane operator ... folding clothes," or why such arrangements would be material to the Army. Am. Compl. ¶ 207. Count 1(M) will be dismissed for failure to state a claim.
10. Count 1(O): Charging the Army for Medical Services that Subcontractor Was Not Subcontracted to Perform
Plaintiff-Relators allege that a DynCorp "subcontractor deployed medics to sites in which DynCorp International knew they were not authorized or funded to work" and that DynCorp then billed the Army for these unauthorized services. Id. ¶ 235. DynCorp responds that Plaintiff-Relators have misconstrued the required authorization for medical services and have failed to allege DynCorp charged the government for services it did not provide. DynCorp. Mem. at 36-37.
As the Court reads the Amended Complaint, Plaintiff-Relators' claim is simply that medical services needed at the Band 5 sites were beyond the scope of the existing contract, DynCorp nonetheless provided those services, and the Army completed the approvals and paperwork retroactively. See Am. Compl. ¶¶ 239-40. Plaintiff-Relators cannot meet the scienter requirement, since they do not allege that the Army was unaware that the medics had been deployed, or that it was unaware that it was billed for those services. At most, the deployment of medics to sites outside the scope of existing contract might constitute a breach of contract claim, but it does not make a claim under the False Claims Act. See Kellogg Brown & Root , 800 F.Supp.2d at 155. Here, Plaintiff-Relators do not allege that DynCorp submitted billings to the Army for medical services not provided, i.e. , "false," but only that the LOGCAP IV contract did not identify the smaller bases as locales for medics.
Further, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." Escobar , 136 S.Ct. at 2003. Plaintiff-Relators allege that funding for the medics was never approved and that the costs were paid from "unspecific funds." Am. Compl. ¶¶ 232, 242. But the Court cannot reasonably interpret the LOGCAP IV contract as entitling the Army to receive additional medical services for an extended period for free. If DynCorp initially agreed to provide medics without charge, no contract term required it to do so continuously (or to ignore Army officers' requests for medics at forward bases where fighting may have been occurring). At some point DynCorp requested, and the Army approved, funding for "unspecified costs" which went towards medical services. Id. ¶ 242. Claim 1(O) will be dismissed for failure to state a claim.
11. Count 1(P): Making Numerous Related Fraudulent Charges to the Army[26] ,[27]
Finally, Plaintiff-Relators fail to explain their allegation of "making numerous related *59 fraudulent charges" by DynCorp. Id. ¶ 1. Such a vague claim is totally lacking in particulars and does not permit DynCorp to defend itself properly. See Williams , 389 F.3d at 1259. Count 1(P) will be dismissed for lack of particularity.
B. Alleged Retaliation
The False Claims Act also protects those who complain from retaliation. See 31 U.S.C. § 3730(h). An employer violates the law if its employee is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee ... in furtherance of an action under this section." Id. A retaliation claim must satisfy two elements: (1) the employee must have engaged in protected activity; and (2) experienced discrimination because of that protected activity. Shekoyan v. Sibley Int'l , 409 F.3d 414, 422 (D.C. Cir. 2005). While a plaintiff need not anticipate a statutory claim under the False Claims Act, he must have been investigating "more than his employer's compliance with federal or state regulations" and have been acting outside his normal job responsibilities. Id. at 423. Employers cannot intend to retaliate under the False Claims Act unless they have knowledge that an employee engaged in protected activity. See Williams , 389 F.3d at 1260-61. Thus, "plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must 'overcome the presumption that they are merely acting in accordance with their employment obligations' to put their employers on notice." Id. at 1261 (quoting United States ex rel. Yesudian v. Howard Univ. , 153 F.3d 731, 744 (D.C. Cir. 1998) ). A plaintiff-relator need not prevail on a False Claims Act claim to recover on a retaliation claim. Hoyte v. Am. Nat. Red Cross , 518 F.3d 61, 67 (D.C. Cir. 2008) (citing Yesudian , 153 F.3d at 739 ).
Williams is especially instructive. In Williams , the eponymous qui tam plaintiff was the chief contract negotiator between his defense-contractor employer and the U.S. Navy, and so was responsible for reviewing cost and pricing data submitted by the defense contractor to the government. Mr. Williams informed his superiors of a pricing discrepancy, then informed the Navy, and then was fired. The D.C. Circuit held that
[u]nless the employer is aware that the employee is investigating fraud, ... the employer could not possess the retaliatory intent necessary to establish a violation of [the FCA].... Thus, without evidence that the employee expressed any concerns to his superiors other than those typically raised as part of a contract administrator's job, an employer could not be on notice that the employee was acting in furtherance of an FCA action.
Williams , 389 F.3d at 1260-61 (internal cites and marks omitted). The Circuit determined that Mr. Williams was acting within his regular capacity when he informed his superiors of the pricing discrepancy. It also determined that Mr. Williams was not acting in his regular capacity when he stepped outside of his organization and informed the Navy of that same discrepancy. At that point the defense contractor was "on notice that litigation was a reasonable possibility," id. at 1261, and for that reason Mr. Williams' retaliation claim was allowed to proceed.
*60 Plaintiff-Relators allege that DynCorp retaliated against them because they "protested to management when they discovered fraudulent activity." Am. Compl. ¶ 252a. Plaintiff-Relators further allege that they "each specifically confronted management with issues involving fraudulent activity in the performance of the LOGCAP IV contract," and that they were terminated in retaliation for these confrontations. See id. ¶¶ 253a-54a. DynCorp argues that Plaintiff-Relators were "simply performing [their] ordinary duties." DynCorp Mem. at 38 (quoting Williams , 389 F.3d at 1261 ).
1. Count 2(A): Retaliation Against Mr. Hutchins
Plaintiff-Relators argue that Mr. Hutchins and Ms. Subhi "are in unusual positions as relators" because they "are experts in the areas about which they complain and worked." Opp'n at 3. As a subcontracts senior manager, Mr. Hutchins was responsible for ensuring "that DynCorp International complies with contract requirements so that DynCorp International [could] represent to the United States that it is in compliance with the United States' regulatory and contractual requirements." Am. Compl. ¶ 13. As part of his job, Mr. Hutchins "reviewed information and documents provided to assure compliance with contractual and regulatory requirements." Id. ¶ 14. When he identified billing and paperwork discrepancies, he notified his superiors. See, e.g., id. ¶ 192. In August 2012, Mr. Hutchins also submitted a memorandum, "[u]pon direction from more senior management," summarizing his concerns about the buses. Id. ¶ 167. Mr. Hutchins was terminated on August 28, 2012 for "an unspecified violation of DynCorp's Code of Conduct." Id. ¶ 177.
DynCorp argues that Mr. Hutchins cannot state a claim because his alleged investigations fall squarely within his job description, and he did not give DynCorp notice that he was otherwise engaging in protected activity. Plaintiff-Relators unhelpfully respond that "[t]here is nothing to demonstrate that either Hutchins or Subhi were 'simply performing his [her] ordinary activities' by reporting the alleged false or fraudulent conduct," Opp'n at 33, then restate the allegations in the Amended Complaint. Id.
Reading the Amended Complaint in the light most favorable to Mr. Hutchins, because Mr. Hutchins does not allege that he performed investigative or reporting activities outside of his regular job description, the Court understands his argument to be that "performance of [his] normal job responsibilities constitutes protected activity." Williams , 389 F.3d at 1261. However, the D.C. Circuit already disposed of this argument in Williams . "[W]ithout evidence that the employee expressed any concerns to his superiors other than those typically raised as part of a contract administrator's job, an employer could not be on notice that the employee was acting in furtherance of an FCA action." Id. (internal quotation marks omitted). No matter how harsh its actions, without such notice, DynCorp could not have the intent to retaliate against Mr. Hutchins for engaging in protected activity under the False Claims Act. Id. at 1260-61.
Further, unlike the plaintiff in Williams , Mr. Hutchins cannot salvage his claim with references to other activities performed beyond the scope of his ordinary responsibilities. Although he now characterizes the activities he observed as fraud, he did not describe these activities as fraudulent when he reported them to his superiors, see, e.g. , Am. Compl. ¶ 192 (describing only possible contractual remedies against DynCorp); he did not advise DynCorp to seek legal counsel; he did not step outside the usual chain of command to express his concerns; and he did not inform *61 the Army of the alleged fraud until after he had been terminated. While Mr. Hutchins was not required to "incant talismanic words to satisfy the notice element," Williams , 389 F.3d at 1262, his day-to-day job of reviewing DynCorp's compliance with regulatory and contractual requirements did not automatically grant protected status to any noncompliance he may have discovered. Cf. United States ex rel. Schweizer v. Oce N.V. , 677 F.3d 1228, 1239 (D.C. Cir. 2012) (finding plaintiff-relator "cannot succeed unless she alerted [her employer] of her protected conduct by acting outside her normal job responsibilities"). Thus, he has failed to overcome the presumption that he was "merely acting in accordance with [his] employment obligations." Williams , 389 F.3d at 1261.
Seeking to avoid this conclusion, Mr. Hutchins alleges that, just a few weeks before being terminated, he had been put on a DynCorp "trouble-maker" list. Am. Compl. ¶ 175. He also alleges that on the day he was terminated, an email went out instructing other employees not to respond to his requests for information. Id. Mr. Hutchens offers no more details and presumably knows none. Assuming the truth of the first allegation-that there were identified "trouble-makers" and he was so identified-the allegation does not support an inference that this list described potential False Claims Act litigants. As to the second, the actual fact-employees were instructed not to provide operational information to an exiting colleague-allows only a smidgen of an inference that the reason behind this direction was to retaliate against Mr. Hutchins rather than to protect corporate information. The Court does not find that DynCorp was put on notice that "litigation was a reasonable possibility," which is necessary to support a claim for retaliation. Williams, 389 F.3d at 1261. Claim 2(A) will be dismissed for failure to state a claim.
2. Claim 2(B): Retaliation Against Ms. Subhi
Ms. Subhi had the same title and general responsibilities as Mr. Hutchins. See Am. Compl. ¶¶ 16-17. She was terminated by DynCorp in April 13 for "an alleged ethics violation," to wit working in the same department as her son. Id. ¶ 284. Like Mr. Hutchins, Ms. Subhi's argument in the Amended Complaint is that performance of her normal job responsibilities constituted protected activity. Consistent with that argument, and also like Mr. Hutchins, Ms. Subhi did not allege fraud to her managers; did not step outside the usual chain of command; did not inform the Army of the alleged fraud until after she was terminated; and otherwise took no other steps to indicate to DynCorp that litigation was a reasonable possibility. Thus, for the same reasons as with Mr. Hutchins, the Amended Complaint does not support a reasonable inference that DynCorp knew enough to intend to retaliate against Ms. Subhi.
Ms. Subhi focuses on the alleged pretext behind her termination: "it is not unusual for family members to work together at DynCorp." Id. Assuming this to be true, it fails to substitute for evidence that DynCorp knew she had engaged in protected activities and fired her because of them. The Court makes all reasonable inferences in favor of Ms. Subhi but finds that she has not yet made out a prima facie case of retaliation. Claim 2(B) will be dismissed for failure to state a claim.
C. Rule 10(b)
While the Amended Complaint is hardly clear and concise, it is not "too confusing to require [DynCorp] to respond." Cf. Rogler v. United States Dept. of Health and Human Servs. , 620 F.Supp.2d 123, 127-28 (D.D.C. 2009). At the very least, it is not *62 too confusing to determine that dismissal is largely appropriate. However, if Plaintiff-Relators successfully move to file a second amended complaint, they are strongly encouraged to describe each claim as a separate count so that the Court and DynCorp can better follow along.
IV. CONCLUSION
Count 1(C), relating to the allegedly duplicative waste management vehicles, states a plausible violation of the False Claims Act and will be allowed to proceed to discovery. The remaining claims allege various potential breaches of the LOGCAP IV contract during the war in Afghanistan but do not make out violations of the False Claims Act. The Court will grant in part and deny in part Defendants' Motion to Dismiss, Dkt. 38. A memorializing Order accompanies this Opinion.

On page 69 of the Amended Complaint, Plaintiffs restart their numbering at paragraph 242. For the purposes of this opinion, the Court will refer to the second set of paragraphs numbered 242-272 as 242a-272a.

As identified, Paragraph 1 of the Amended Complaint alleges that DynCorp submitted direct false claims by: (a) submitting "false DD Form[s] 250 for supplies and services"; (b) submitting "false and fraudulent invoices"; (c) billing for duplicative vehicles; (i) "requesting funding for medical devices, which were not delivered"; (j) billing for "unauthorized services"; (k) billing "for subcontractor services as purchase order items"; (l) billing "for duplicative or unneeded medical procedures, drugs and material"; and (o) billing for "medical services that subcontractor was not subcontracted to perform."

As identified, Paragraph 1 of the Amended Complaint alleges that DunCorp submitted false certifications by (d) billing for "vehicles which were not up to specifications"; (e) billing "for vehicles which were not mission capable"; (f) billing for "vehicles which were older than ordered"; (h) billing for "vehicles that did not meet specifications" [sic]; and (m) billing "for personnel who were not qualified."

Elsewhere in the Amended Complaint, Plaintiff-Relators allege violations of subsections § 3729(a)(1)(E) and (G). See Am. Compl. ¶¶ 241a-42a. There are no factual allegations to support these allegations.

Paragraph 286 of the Amended Complaint alleges specific violations of the False Claims Act in 16 subparagraphs (¶¶ 286 (a)-(p) ). See Am. Compl. ¶ 286. The Motion to Dismiss does not address each subparagraph individually, but the Court will address each.

As a general matter, DynCorp argues that none of these claims can be material because, per Mr. Hutchins, after months of review "the U.S. army [sic] did not seemed [sic] concerned" and the Department of Justice tried "to dissuade Hutchins from going forward with [this] case." See DynCorp Mem. at 26-27; DynCorp Mot. for Recons. [Dkt. 20] at 2-3. While DynCorp is not inaccurate, the False Claims Act clearly permits a relator to proceed even if the United States declines to participate. See 31 U.S.C. § 3730(c)(3) ("If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action.").

DynCorp argues that consent was not needed for subcontracts less than $550,000 in value. See DynCorp Mem. at 28-29; see also LOGCAP IV Contract at 52. But Plaintiff-Relators allege that the vehicle leases were "worth millions of dollars." Am. Compl. ¶ 76.

In their Opposition, Plaintiff-Relators state that this practice of billing for non-mission-capable vehicles began in 2012, not 2011. Opp'n at 25.

The Amended Complaint is not entirely clear about which equipment and vehicles it refers. Based on context, it is likely that Plaintiff-Relators meant to refer to the vehicles which were "staged on more than 20 Camps and Forward Operating Bases." Am. Compl. ¶ 125.

Plaintiff-Relators advance similar allegations in Counts 1(I) ("[R]equesting and obtaining funding from the United States for medical devices, which were not delivered.") and 1(N) ("[C]harging the United States for services, which were not approved and failed to acquire equipment and provide training specifically approved by the administrative contracting officer and funded by the department of the army."). Am. Compl. ¶ 286. Given the interrelatedness of these allegations, the Court considers Counts 1(I) and 1(N) together.

Plaintiff-Relators also alleged fraud related to an X-ray unit. See Am. Compl. ¶ 208. DynCorp argues that the X-ray unit was the subject of prior litigation under the False Claims Act, see United States ex. rel. Greer v. DynCorp Int'l Inc. , No. 13-cv-326, Compl. Dkt. 1 ¶ 67 (D.D.C. Sept. 15, 2017), and that Plaintiff-Relators are not original sources of information and cannot pursue this claim themselves. See DynCorp Mem. at 35 n.21; 31 U.S.C. § 3730(e)(4)(A) and (B). Plaintiff-Relators have withdrawn Count 208 and their claim concerning an X-ray unit. See Opp'n at 29 n.18. As is clear above, the circumstances related to the X-ray unit overlap almost entirely with those of First-Aid training.

It appears that the funding was actually moved within the same OnSite Occupational Health and Safety subcontract. See Am. Compl. ¶ 222.

This also undermines a finding of materiality, since the Army was aware of the practice and paid DynCorp anyway. See Escobar , 136 S.Ct. at 2003-04 ("[I]f the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, ... that is strong evidence that the requirements were not material."). Plaintiff-Relators contend that the "government knowledge defense" is premature at the motion to dismiss phase. Opp'n at 9-10; see also United States v. Southland Mgmt. Grp. , 326 F.3d 669 (3rd Cir. 2003) ("The inaptly-named 'government knowledge defense' captures the understanding that the FCA reaches only the 'knowing presentation of what is known to be false.' "). But here what the government knew goes to materiality, not DynCorp's knowledge of falsity.

The Amended Complaint ambiguously recites that "they stated that the vaccines were still good even though the effective date listed on the vaccine had expired." Am. Compl. ¶ 266. In context, this appears to be a statement made by the medical personnel in India and Dubai to DynCorp, not by DynCorp to the government.

The Court notes that Ms. Wrubbel's report is not alleged to be so broad as to cover "each DynCorp International department in Afghanistan," Am. Compl. ¶ 198, and to the extent that this claim relates to unspecified departments, it will be dismissed for lack of particularity.

The Court notes that it can find no reference to educational requirements in the LOGCAP IV contract submitted by DynCorp. Such requirements may be contained in one of the regulations, reports, or work plans also incorporated into the contract but not submitted, see Opp'n at 2 n.2, but Plaintiff-Relators fail to provide proof to that effect.

Plaintiff-Relators omit Count 1(P) from their discussion as to which claims are "direct false claims" and which are "implied false certifications." See Opp'n at 8 n.7.

Plaintiff-Relators make two references to allegations of conspiracy, presumably in violation of 31 U.S.C. § 3729(a)(1)(C). Plaintiff-Relators allege that "in carrying out these wrongful acts, defendants participated in a conspiracy to make false claims for payment from the United States." Am. Compl. ¶ 244a. Plaintiff-Relators also allege that DynCorp and former defendant Onsite Occupational "conspired with unnamed persons and entities to make false claims against the United States." Id. ¶ 3. These oblique references to "conspiracy" do not constitute legal claims; DynCorp does not address them in its motion to dismiss and Plaintiff-Relators make no attempt to revive them in their Opposition. All claims of conspiracy will be dismissed for failure to state a claim.